## HAMMOND *v.* HOPKINS.

APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 62. Argued November 11; 12, 1891.—Decided February 29, 1892.

A court of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there has been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred; and in these respects each case must be governed by its own circumstances.

A purchase by a trustee of trust property, for his own benefit, is not absolutely void, but voidable; and it may be confirmed by the parties interested, either directly, or by long acquiescence, or by the absence of an election to avoid the conveyance within a reasonable time after the facts come to the knowledge of the *cestui que trust.*

Two partners owned real estate in common, some of which was used in the partnership business. One died making the other by his will a trustee for the testator's children, with power of sale of all the real estate, and directing that the business be carried on. After carrying on the business for some time the trustee sold the real estate, by auction, and bought portions of it in through a third person, and accounted for the half of the net proceeds. This transaction was open, and was known to all the *cestuis que trustent,* and was objected to by none of them. *Held,* That there was nothing in all this to indicate fraud.

In all cases where actual fraud is not made out, but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollection of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence.

THE court stated the case as follows:

This was a bill filed in the Supreme Court of the District of Columbia, April 8, 1884, by William B. Hopkins; Anna B. Hopkins, by her next friend William B. Hopkins; Sarah E. Hopkins, by her next friend Elizabeth A. Early; Elizabeth A. Early; Mary V. Wailes; Alice C. Hall; and Ida M. Stone; against Bertha Hopkins; Bertha Hopkins, administratrix of John S. Hopkins; Esther E. Hopkins; Elizabeth B. Luttrell; Ira W. Hopkins; Mary E. Hopkins; Bettie Davenport; Samuel C. Raub, trustee for Bettie Davenport; Samuel C. Raub, executor of George N. Hopkins; L. Freddie Hopkins, administratrix; Thomas J. Luttrell, administrator of George W. Hopkins; and Thomas J. Luttrell, executor of Cornelius Hopkins; alleging that prior to and on the 23d day of November, in the year 1858, John Hopkins and George W. Hopkins were seized and possessed in fee simple, each of an undivided moiety, as tenants in common, of squares numbered ninety-four (94), ninety-five (95), ninety-six (96), one hundred and ten (110), and one hundred and eleven (111), in the city of Washington, as laid down on the public plats of the city; and that John Hopkins, on that day, executed his last will and testament, a copy of which was annexed. That John Hopkins died November 27, 1858, leaving his children and heirs-at-law, Isaac H. Hopkins; Elizabeth A. Early, born Hopkins; George Washington Hopkins; William M. S. Hopkins; Emeline V. Lilburn, born Hopkins; Mary V. Wailes, born Hopkins; Alice C. Hall, born Hopkins, John S. Hopkins, and Levin Hopkins. That Isaac H. and Levin Hopkins have since died intestate and without issue; that George Washington Hopkins died in the month of July, 1870, leaving as his only children and heirs-at-law, William B. Hopkins, then eleven years of age, and Anna B. Hopkins, then two years of age; that the said Emeline V. Lilburn conveyed

on April 7, 1884, all her right and title absolutely and uncon-
ditionally in said estate to her daughter Ida M. Stone; and that
John S. Hopkins died May 7, 1883, leaving as his only child.
and heir-at-law the defendant Bertha Hopkins.

That the said George W. and John S. Hopkins accepted the
said trust, entered into possession of said premises, carried on
the business of brick making for several years, collected the
rents and profits of said estate, and, as is charged upon infor-
mation and belief, sold at various times prior to May 1, 1864,
portions of said property for which they received certain
moneys, the particulars of which complainants propose to
prove before the auditor.

It was then charged that it had lately come to the knowl-
edge of the plaintiffs that "at this period" the trustees medi-
tated a fraudulent scheme to obtain the entire estate in their
own right, "freed and discharged of the trusts under which they
held it," and that, "in pursuance of this scheme of fraud," John
S. Hopkins persuaded his brother William M. S. to convey to
him his share in his father's estate, (William being of dissi-
pated habits and mentally enfeebled by alcoholic excesses,) by
deed dated June 20, 1860, and recorded July 7, 1860, and
under his command and direction to sign the name of his wife,
Sarah E. Hopkins, thereto; and by means of fraud obtained
the certificate of acknowledgment to said deed of two justices
of the peace. Ignorance of these facts was averred, the cir-
cumstances of their discovery to be thereafter stated at length.

It was further stated that William M. S. Hopkins on Janu-
ary 28, 1864, conveyed all his right, title and interest in his
father's estate to one Christopher Ingle, in trust for the bene-
fit of his wife Sarah E. Hopkins, which fact had lately come
to the knowledge of the complainants under circumstances that
would thereinafter be set forth at length.

The bill then alleged that in pursuance of the fraudulent
scheme before mentioned the trustees advertised the property
for sale at public auction on May 10, 1864, a copy of which
advertisement was annexed. That they fraudulently procured
James Chapman to attend the sale and bid on their behalf as
individuals, and that Chapman became the purchaser for them

of squares 95, 96 and 111; of lot 1, square 94; and lots 16, 17, 18, 19, 20, 21, 22, 38 and 39, in square 110; and that on May 20, 1864, George W. and John S. Hopkins conveyed the property to Chapman for the consideration of one dollar, and Chapman reconveyed, under the same date, square 111 to George W. Hopkins, as an individual, for the alleged consideration of $9093.42, and the other property to George W. and John S. Hopkins, as individuals, for the alleged consideration of $10,-842. 24, all the conveyances being recorded November 16, 1864. Plaintiffs averred that the purchases by Chapman were for the benefit of the trustees as individuals without the knowledge or consent of the plaintiffs.

It was further charged that "the said trustees, in furtherance of their said fraudulent scheme to possess themselves individually of the said trust estate and brick business, and in order to give a semblance of right to their said fraudulent conduct, did, after a lapse of nearly seven years from the death of their testator, file in the orphans' court of said district 'a first and final account' of what purported to be an 'account of the personal estate of John Hopkins, deceased, by George W. and John S. Hopkins, executors,' alleged to consist of the personal estate of said decedent, of the profits made out of the brick business, and the value of the deceased's interest in the firm of John and George W. Hopkins, showing that there was for distribution the sum of $22,131.46, and these plaintiffs have caused diligent search to be made among the records of said orphans' court for the vouchers and papers on which said account was based, but have not been able to find the same, so as to discover in what manner the item of $14,952.66, the proceeds of sale of the half interest, was made up, a certified copy of which account is herewith filed and prayed to be read as a part of this bill; and the said trustees, without explaining the nature of their trust or their fraudulent conduct in regard to said sales, and without actual notice to or any personal knowledge of any of these plaintiffs, did obtain an order of said court directing a distribution of the sum of $2667.60 to each of the children then living of said John Hopkins as heirs-at-law." The payment of the distributive shares under the order,

(except that allotted to William M. S. Hopkins,) was admitted, but the jurisdiction of the court denied, and ignorance of the alleged fraud set up in excuse of any estoppel arising from the acceptance of and receipts for their shares.

Certain sales to *bona fide* purchasers prior to November 16, 1864, and prior to December 22, 1875, were referred to, and the receipts of moneys therefor. It was then alleged "that the said trustee, George W. Hopkins, trustee as aforesaid, died intestate on the 22d December, 1875, leaving as his only children and heirs-at-law George N. Hopkins; said defendants, Elizabeth B. Luttrell, born Hopkins, Ira W. Hopkins, Mary E. Hopkins, and Cornelius Hopkins; that letters of administration on his estate were granted to said defendants, L. Freddie Hopkins and Thomas J. Luttrell; that said George N. Hopkins has since died, on Nov. 18th, 1881, having first devised, by way of executory devise, all his real estate to said defendant Samuel C. Raub, as trustee for said defendant Bettie Davenport, her heirs and assigns; that the contingency on which said devise was limited has happened, and the equitable estate in fee simple is vested in her, as all of which will more fully appear by reference to said will hereto annexed, and prayed to be read as part of this bill; that letters of administration on said George N. Hopkins' estate were granted to said defendant, Samuel C. Raub; the said Cornelius Hopkins has since died, on July 17th, 1883, having devised his entire estate as follows: One-half to said defendant Mary E. Hopkins, one-quarter to said defendant Elizabeth B. Luttrell, and one-quarter to said defendant Ira W. Hopkins; that to said Thomas J. Luttrell letters testamentary have been granted as executor of said Cornelius Hopkins."

Partition proceedings between John S. Hopkins and the heirs of George W. Hopkins, and between the heirs of George W. Hopkins, were then set up, and the sale by John S. Hopkins of lots allotted to him to *bona fide* purchasers, as also by the heirs of George W. Hopkins. It was further averred that John S. Hopkins died May 7, 1883, leaving him surviving, his widow, Esther E. Hopkins, and Bertha Hopkins, his only child and heir-at-law, and that letters of adminis-

tration on his estate had been granted to Bertha Hopkins as sole administratrix.

The bill then stated:

" That these plaintiffs do severally aver that they have within the last past few weeks discovered for the first time the following circumstances in the manner herein set out, namely, that when the said John S. Hopkins, trustee, induced his brother and *cestui que trust,* William M. S. Hopkins, to convey to him his estate, as alleged in paragraph eight, the said John S. Hopkins charged the said William that he should not tell his wife, the said plaintiff Sarah E. Hopkins, of his having made such deed, and threatened him that if he did his said wife would leave him and return to Baltimore to her father; that numberless times from that time to the date of his death the said John S. Hopkins inquired of the said William if he had ever informed his wife of the conveyance to him, and on every occasion urged him not to do so; that the said William, being always poor and frequently in positive want for the absolute necessities of life, was constantly importuning the said John S. Hopkins for his share of the estate and waiting for a division when the said John S. Hopkins did pay to the said William at various times in all about nine hundred dollars, and put him off by alleging that he was waiting for the property to rise in value, and when he sold that the said William would get his share. At other times when the said William would threaten to sue the said John S. Hopkins, the latter would bluff him off by such statements that if he did sue he would not get a cent, but that he would give it to his wife who had separated from said William, and that so it was, by intimidations, threats and promises, the said William was always waiting to the hour of the death of the said John S. Hopkins in the hope that he would get his share of the estate; that when the said John S. Hopkins died unexpectedly on May 7th 1883, and had made no provision for the said William, the said William began to seek the advice of counsel as to what were his rights, and after having consulted several without effect, at a considerable waste of time, finally placed his case, about the first of February last past, in the

hands of Samuel L. Phillips, attorney-at-law; that the said attorney undertook the investigation of the case, and discovered for the first time from living disinterested witnesses that the said James Chapman had never paid one dollar of consideration for said land, but had bought the same for and on account of said trustees, and that the sale was fraudulent and void; that the said attorney discovered that the said William had conveyed his interest to said Ingle in trust for said plaintiff Sarah E. Hopkins, his wife, and if any recovery was to be had the said Sarah E. Hopkins should be informed of her rights. The said attorney thereupon wrote a letter to said Sarah E. Hopkins, residing in Baltimore, Md., and who in a day or two after its receipt came to Washington, called on said attorney, and this plaintiff Sarah E. Hopkins avers was told for the first time in her life on the 5th of February, 1884, either of the conveyance by said William to said John S. Hopkins, or the conveyance of William to said Ingle in trust for her benefit, or of the fraudulent practices of said trustees as hereinbefore set forth as to the purchase of said land, and the said Sarah E. Hopkins has thereupon authorized said attorney to bring suit to enforce her rights; that in order to secure further information, if any existed, the said attorney instructed the said William to call on his sisters and make an appointment with them to see him, said attorney, which the said William did do during the month of February or March, 1884, and at which interview the said William informed these plaintiffs Elizabeth A. Early, Mary V. Wailes and Alice C. Hall, of the discovery of witnesses who would testify that the said sales from said trustees to said Chapman and said Chapman to said George W. Hopkins and John S. Hopkins jointly and to said George W. Hopkins individually were without consideration, fraudulent and void, as hereinafter set forth, and these plaintiffs aver that this was the first time in their lives that they or either of them had ever been informed or in any manner known of said fraudulent sales or had any reason to suspect that the same were not true and *bona fide;* that the said attorney called March 27th last past on these plaintiffs Elizabeth A. Early, Mary V. Wailes and Alice C. Hall, and

said Emeline V. Lilburn, and they severally aver that they were informed by said attorney for the first time of the particulars of the fraudulent practices of said trustees in buying at their own sales through said Chapman, as hereinbefore set forth; but on the contrary aver that by the assurance of said trustees that the same were *bona fide*, by the suppression of the truth these many years, by the fact that they were always informed that the said trustees had plenary power under said will of their father, by the great confidence they had in the integrity of their said uncle, by their incapacity as females, entirely unused to business, these plaintiffs Elizabeth A. Early, Mary V. Wailes, Alice C. Hall and their sister, Emeline V. Lilburn, have uncomplainingly submitted to what they have often deplored as their ill fortune, while another member of the family, their own brother, and his daughter, claiming through the same ancestors, was in possession of estates worth over two hundred thousand dollars; that these plaintiffs thereupon immediately resolved to enforce such rights as they were entitled to, and authorized said attorney to take the necessary legal proceedings; that this plaintiff William B. Hopkins was a child only five years of age when said fraudulent sale was made, and said plaintiff Anna B. Hopkins, was not born for nearly five years afterwards, and that this plaintiff William B. Hopkins on the 31st day of March last past, was for the first time in his life informed of the facts hereinbefore recited as to said fraudulent conveyances by said trustees and Chapman; the said Anna B. Hopkins is still an infant fifteen years of age; that Emeline V. Lilburn, the grantor of this plaintiff Ida M. Stone was present on March 27 last past at the interview of said attorney with her said sisters, and heard for the first time in her life that the said sales from said trustees to said Chapman and back to said George W. Hopkins and John S. Hopkins and George W. Hopkins individually were fraudulent and void for the causes herein set forth; and the said plaintiff Ida M. Stone does aver that down to said 27th day of March the said Emeline V. Lilburn knew nothing of said fraudulent practices of said trustees or either of them, but on the contrary discovered the same in the manner hereinbefore set forth;

and the said plaintiff Ida M. Stone does aver that she was ignorant of the same down to April 7, 1884, the date of the conveyance to her, said plaintiff, by her mother, said Emeline V. Lilburn.

"Whereby if these plaintiffs shall prove these facts to the satisfaction of your honorable court, they allege that they have been guilty of no negligence in the prosecution of their rights, and are entitled to relief.

"That these plaintiffs have been informed and so aver that there is yet unsold a large portion of said estate, and in the possession of said defendants, namely, sublots four and six, in square 95; subdivision lots 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 39 and 40, in square 96; subdivision lots 14 and 15, in square 94; and that the same are worth two hundred thousand dollars, and that the distributive share of each of these plaintiffs will amount to twenty thousand dollars."

Complainants thereupon prayed that the deeds "from said trustees to said Chapman, and from said Chapman to said George W. Hópkins and John S. Hopkins jointly, and to said George W. Hopkins individually, may be declared void and cancelled, and that the said estate is held by the defendants, as heirs-at-law of said George W. Hopkins, on the original trusts mentioned in said will of John Hopkins, deceased. That the said estate may be divided, as it was the duty of said trustees to have done. That an account may be stated of the sums received, with interest, on all sales made by said trustees or either of them, or by any of the defendants, and also of what these plaintiffs or either of them received, with interest, on said pretended division, and that these plaintiffs may be allowed, according to their respective interests, their shares of such sales, and that such sums found to be due to each of these plaintiffs may be declared to be a lien on the said real estate respectively held by them, the defendants." And for judgment and execution; injunction; a receiver; and general relief. Answers under oath were expressly waived.

Among the exhibits attached was a copy of the will of John Hopkins, as follows, omitting some formal and immaterial portions:

"I give and bequeath my little slave boy Frank to my daughter Victoria Hopkins, as her sole and absolute property.

"I give and bequeath my servant woman Leah aged about twenty-seven years, and her youngest child Robert and any increase of said slave woman, to my daughter Alice as her sole and absolute property.

"I give and bequeath my slave woman Hannah and any increase she may have to my daughter Elizabeth A. Early as her absolute property, on the condition however that the sum of four hundred dollars shall be deducted from my said daughter's share in the final distribution as hereafter provided.

"I give and bequeath all the rest and residue of my property of every description, real, personal and mixed, situate and being in the District of Columbia or elsewhere, to my brother George W. Hopkins, and my son John S. Hopkins, and the survivor of them and the heirs, executors, administrators and assigns of such survivor. In trust nevertheless and to and for the uses and upon the trusts following and none other, that is to say:

"To carry on the brick-making business as now conducted by my said brother George W. Hopkins and myself in Washington city, D.C. Said business to be under the direction of my said brother George W. Hopkins assisted by my said son John S. Hopkins as clerk, for which he is to receive a regular stated salary.

"To receive the rents, profits, issues and income of said estate, and of said business, or my portion thereof, and to apply the same first and immediately without waiting for the year allowed by law to expire, to the payment of my funeral expenses, and all my just debts, which are few, next to a reasonable and proper pay or salary to my said son John S. Hopkins, as clerk in said business at the kiln, said pay to be sufficient for the reasonable and proper maintenance of my said son and his family, and then to the proper and reasonable expenses and support of my family (including my said daughter Elizabeth A. Early and her daughter) as it now exists, and the education of the younger members thereof: And the surplus of such rents, issues, profits and income, if any, shall be.

from time to time (after the payments from time to time as above) invested by my said trustees as hereafter stated, or, may [be] from time to time in such sum or sums advanced by my executors and trustees as they may in their discretion deem fit to such of my children as my said trustees and executors may think really need and deserve it, such sums so advanced to be, without interest, deducted from the share or shares of the child or children receiving the said advances, in the final distribution of my estate as hereafter provided: And upon further trust that my said trustees shall (where in their judgment a sale of the real property owned by me and my said brother George W. Hopkins, or any part thereof, or of the brick-kilns and the materials or implements thereunto belonging, or of said business, is essential or necessary for any cause whatever or would be advantageous) sell and dispose of at public or private sale, at such time or times after such notice and upon such terms as they may deem most for the interest of my estate, and by proper conveyances convey the same to the purchasers, who, having paid his or her purchase-money to my said executors, shall be under no obligation to see to the application thereof under the trust of this, my will, nor answerable for the misapplication of the same: And upon further trust that the proceeds of any such sales, as well as the surplus proceeds or incomes as hereinbefore stated, if any there be, shall be by my said trustees reinvested in such safe and profitable securities as to my said trustees shall seem best, whether the same be in real estate, mortgages, deeds of trust or stocks, subject, however, to the privilege of advances as already given and stated, of which the said trustees are alone to judge: And upon further trust that upon the arrival of my daughter Alice to the age of eighteen years, which will occur on or about the first day of May, eighteen hundred and sixty-four, my estate of every kind shall be divided by my said trustees and executors among my children, deducting from the share of each child in such division the amount of such advances so as aforesaid made to him or her, and deducting from the share of my said daughter Elizabeth A. Early, the sum of four hundred dollars for the slaves aforesaid bequeathed

to her, provided, however, that no deduction is to be made in such final division from the shares of those children now at home and remaining there as of my family (nor from the share of my said daughter Elizabeth A. Early for the board and maintenance of her said daughter Mary), for any amount advanced for the support of the family for the education of Alice; and in further trust that my daughter Alice's portion in such division shall be held and taken by my said trustees in trust for her until her arrival at the age of twenty-one years, or her marriage, and the interest of her share until the happening of either event shall be paid towards her support and comfort: and upon her arrival at the age of twenty-one years, or her marriage, her portion shall be paid or delivered at once to her in such manner as my said trustees shall think most for her interest, and in case of her death before marriage or becoming of the age of twenty-one years, her said share be divided equally among the rest of my children.

"And upon further trust that the respective shares of my sons Isaac and Levin shall also be taken and held by my said trustees in trust for said sons Isaac and Levin or be paid over to them by instalments, or in whole, or retained and the interest paid them as in the judgment of my said trustees may seem best and most for the interest of my said sons Isaac and Levin.

"I wish and direct that in the division of my estate as aforesaid, such of my slaves as have not been hereinbefore bequeathed, shall be appraised, by agreement among my children, by my said trustee, or by disinterested persons elected by said trustee, and that my children shall each select for herself or himself the slave or slaves they may each desire, or, if that cannot be done, that the distribution of such slaves among my children be by lot, and that the amount of the appraisement of such slaves so selected or drawn shall be so much of the share of the child so selecting or drawing. I wish and direct that my slaves shall not be sold out of the family before such final division of my estate nor after such division by the children to whom they may be respectively allotted in such division, unless for grossly improper conduct or insubordination. I

greatly desire, as already stated, that my family shall remain as it now is, without change or modification or sale or valuation of the furniture or slaves until the said division of my estate, and that it shall until then be supported by the brickkiln business as though I were living, and as I believe the squares and lots of ground owned by my brother George and myself is now and will continue to increase in value, I desire, if possible, that said land may be kept unsold and undivided until as above stated, as it will thus be greatly to the advantage of my family; but as circumstances, now unforeseen, may make a change necessary or desirable, I cheerfully trust in the prudence and discretion of my said trustees, and I give them full power as above to exercise their judgment as circumstances may arise, making it proper to dispose of said land and business, or to change and alter the same, believing that they will have the comfort and welfare of my family and their relatives much at heart.

"Lastly, I hereby nominate and appoint my said brother, George W. Hopkins, and my said son, John S. Hopkins, executors of this my last will and testament, hereby revoking and annulling all other wills heretofore made."

Also the advertisement of the sale of May 10, 1864:

"By Jas. C. McGuire & Co., Auctioneers.

"Executors' Sale of Valuable Brick Yard and Appurtenances.

"The whole square No. 111, with fine brick residence and out-buildings, large number of lots, some of them improved with frame dwelling-houses, together with the machinery, material, and implements for the manufacture of brick. On Tuesday afternoon, May 10th, at 3 o'clock, on the premises, we shall sell the whole of squares Nos. 95 and 96, in the northern part of the First Ward, on Twentieth street west, known as 'Hopkins' brick yard,' which is believed to be one of the best located in the District, having both Georgetown and Washington for a market, an abundance of fine clay, brick and tempering sheds, kilns, offices, and all necessary outfit for a first-class brick yard. The yard will be worked until the day of sale.

"Immediately after we will sell the stock of horses, mules, carts, wheelbarrows, buggy, moulds, sieves, sand, &c., &c.; also the whole of square No. 111, formerly the residence of Colonel Eaton, fronting respectively on Connecticut avenue, 20th street north, Q and R streets, and 19th street west, improved by a large brick dwelling-house and back buildings, carriage-houses, stabling, &c., &c., the whole enclosed and beautified with fruit and ornamental trees and shubbery.

"Also —

"Lots Nos. 8, 9, 10, 15, 16, 17, 18, 19, 20, 21, and 24, in subdivision of square No. 110, fronting each on 20th street, between R and T streets.

"Lots 36, 37, 38, 39, 42, 43, 44, and 45, in same square, fronting on 19th street west between R and T streets. Four of the latter are improved each with a small frame dwelling-house, and will be sold separately.

"Also —

"The whole of square No. 94, fronting respectively on Massachusetts avenue, 20th and 21st streets west and north, Q street, with the improvements, consisting of one large frame stable and sheds, two small frame houses, and an office.

"Terms of sale: One-third cash, the remainder in 6, 12, and 18 months, with interest, secured by a deed of trust on the premises. All conveyancing, including revenue stamps, at the cost of the purchaser.

"A cash payment on each piece of real estate will be required at the time of sale.

"GEO. W. HOPKINS,
"JOHN S. HOPKINS, *Executors.*
"(Chron. & Star.) JAS. McGUIRE & Co., *Auct's.*"

A copy of the "first and final account of George W. and John S. Hopkins, executors of John Hopkins, deceased, the requisite legal notice having been given," was also annexed, and other exhibits.

Defendant Davenport answered, setting up, among other things, the death of the child referred to in the will of George N. Hopkins, and the conveyance of the real estate therein

named to her by defendant Samuel C. Raub, as to whom the bill was taken as confessed.

· The answers of defendants Bertha Hammond, Esther E. Hopkins, Elizabeth B. Luttrell, Ira W. Hopkins, Mary E. Hopkins, and Thomas J. Luttrell were duly filed, denying specifically the different allegations of fraud. They admitted that Chapman purchased for the benefit of the trustees, and one of them, but with the knowledge and acquiescence of all parties interested; and the circumstances in reference to the sale were thus set forth in the answer of Bertha Hammond :

"Further answering, on information and belief, the matters alleged in the three foregoing paragraphs, I say that the said George W. Hopkins and the testator, John Hopkins, were partners in trade for years before the death of the latter, and that their business consisted in the manufacture of bricks, and that the property mentioned was purchased in the years 1849, 1854, and 1855 for the purposes of their said business and used for such purposes, so far as required, until the death of the said John Hopkins, and afterwards, in pursuance of the provisions of his last will and testament, until the youngest child, Alice, had attained the age of eighteen years, which event occurred in April, 1864; that until such time the business of brick-making had continued as before the death of the testator in pursuance of the provisions of his will, but under the authority thereby conferred it had been necessary to dispose of some few pieces of ground, the purchase-money whereof was duly accounted for; that upon the happening of such event, the period fixed by the will for the division of the estate, the children of the said testator were eager to obtain their respective shares of the estate; that it was well known to all the said children that the said George W. Hopkins and John S. Hopkins proposed to continue the said business, and to that end to purchase the necessary parcels of ground at the prices at which the same should sell at public auction; that the said children were not only willing but desirous that the business should be continued and the necessary purchase made, their only interest being in obtaining the best prices; that, in

order to obtain such prices, the whole title to the property was sold, as well the interest of the said George W. Hopkins as of the testator; that the said sale was of the property in separate parcels and was in all respects fairly conducted, and that the prices obtained were the full value of the property; that the said George W. Hopkins and John S. Hopkins bought with full knowledge and consent of the said children and duly accounted for the purchase-money; that at the time of the sale of the property, except where the residence of George W. Hopkins stood in square 111, was a common, the streets of the city not having been opened, and the kilns for burning bricks standing on square 94; that there were no circumstances of suppression or concealment, but the deed to James Chapman, placed upon record, on its face showed only a nominal consideration, and that all parties interested well knew that said Chapman bought for the benefit of the said George W. Hopkins and John S. Hopkins, and that the latter, after the said purchase, continued the said business with the knowledge and acquiescence of the said children of the testator until the death of the said George W. Hopkins, in 1875."

The answers averred that the account of the trustees and executors was properly settled in the orphans' court, and pleaded in bar the order of that court carried into execution by the parties interested. The matters in excuse of laches were denied, and the great length of time, the death of parties and witnesses, the increase in value of the property, and other circumstances, were set up as an equitable bar.

July 8, 1884, an amendment was filed as to paragraphs ten and thirteen of the bill. These amendments alleged prearrangement to prevent competition, and that squares 95 and 96 were offered and sold as an entirety and thereby brought a price far below what they would have brought, if advertised to be sold and sold in lots; that the time was unpropitious for a sale, etc., etc.; and that the trustees had appropriated to themselves part of the personal property belonging to the brick-kiln business. And notice, either actual or constructive, of the proceedings in the orphans' court was denied.

These amendments were answered by the principal defend-

ants and the allegations denied, the defences reiterated and the want of explanation of laches set up.

June 4, 1885, paragraph thirteen of the original bill was again amended by charging that the order of settlement and distribution of the orphans' court was fraudulently obtained, in that neither of the trustees made known to the court the nature of their trust, if the accounts included the proceeds as well as the sales of the real estate, nor informed the court of their fraudulent conduct in regard to the sales, nor that any notice, either actual or constructive, had been given the complainants of the settlement and distribution of the estate; and prayed that the order of distribution might be disregarded and set aside and distribution made of the estate as by law it should be, and the defendants be prohibited from availing themselves of the fraudulent settlement and distribution. Paragraph sixteen was also amended by adding that the trustees failed to account for the sale of lots 12, 13, 14, 15, 25, 26, 29, and 40, of square 110, and had sold and fraudulently paid over to George W. Hopkins one-half of the proceeds of lots 3, 4, and 5, in square 67.

The principal defendants answered these amendments and traversed their allegations. They admitted the sale of the lots in square 110, which were made before May 10, 1864, and averred that the proceeds had been accounted for. They further averred that lots 3, 4, and 5, in square 67, belonged to George W. and John S. Hopkins in common; that the said George W. and John S. Hopkins were partners in the brick-making business prior to 1858, and that these lots were acquired for the purposes of said business, and were so used by them, and that the proceeds of sale were duly accounted for. Replications to all the answers were filed. The cause came on to be heard in special term before Mr. Justice Merrick, and the bill as amended was decreed to be dismissed, with costs. The opinion appears in the record.

On appeal, the court in general term reversed the decree of the special term, and adjudged that the sales to Chapman of May 10, 1864, were fraudulent and void, and that the deeds from the trustees to Chapman and from Chapman to George

W. and John S. Hopkins, as individuals, and the deed from Chapman to George W. Hopkins, individually, were null and void, and that the same be set aside. It was further adjudged that the title of the defendants to the real estate remaining unsold should be divested; and that the defendants should account to the complainants before the auditor for the purchase moneys arising from all sales made by the trustees of portions of the real estate bought through Chapman, with interest; and also for the purchase moneys arising from all sales made by the defendants; and also for all rents and profits received by the defendants. In the account the one-half of the proceeds of the sale of lots 3, 4, and 5, square 67, received by George W. Hopkins, with interest from June 18, 1872, was directed to be included. And the decree provided for a partition or sale of the unsold real estate, with directions to the auditor as to the mode of dividing the proceeds if a sale should take place.

From this decree the defendants and each of them prayed an appeal to this court, which was allowed.

It appeared from the evidence that George W. Hopkins and John Hopkins were brothers and copartners in the business of manufacturing bricks, and for the purposes thereof acquired and used certain squares of ground in the city of Washington, on which there were clay deposits. As early as 1846 they carried on the business on square 67, and in July, 1849, purchased squares Nos. 94, 95, and 96 at a cost of between one and two cents per square foot. Their office and stable were on square No. 94 and their kilns and drying sheds on squares Nos. 95 and 96. August 9, 1854, they purchased square 111, on which was a brick dwelling-house, at the price of five cents per square foot; and on December 27, 1855, square 110 at two cents per square foot. By the deeds for these squares the property was conveyed to the grantees in fee simple as tenants in common. Immediately after the purchase of square 111, George W. Hopkins moved into the dwelling-house thereon and resided there until his death in 1875. On the 27th of November, 1858, John Hopkins died, leaving the last will and testament attached to the bill, which was duly admitted to

probate by the orphans' court December 4, 1858; and George W. and John S. Hopkins qualified thereunder as executors, December 14, and the business was conducted as before.

The family of John Hopkins consisted of nine children, one of whom, Levin, died in 1863, unmarried and intestate, and his share devolved upon the other children; so that when Alice attained the age of eighteen, on April 13, 1864, the estate of John Hopkins was represented by the eight surviving children, his devisees and next of kin. His estate consisted mainly of his undivided moiety of squares 94, 95, 96, 110, and 111.

On September 16, 1859, George W. Hopkins in his own right, and h and John S. Hopkins as executors, made a subdivision of the original lots in square 110, and subsequently sold at different times a number of the subdivision lots. On April 13, 1864, there were unsold in this square the following lots: 8, 9, 10, 15, 16, 17, 18, 19, 20, 21, 24, 36, 37, 38, 39, 42, 43, 44, and 45. John Hopkins resided in Georgetown at the time of his death, and his children or some them continued to reside there until 1862, when they removed to the dwelling-house on square 111 occupied by their uncle George W. Hopkins. When Alice attained the age of eighteen, the seven other children were of about the following ages: Isaac H., 40; Elizabeth A. Early, 39; John S., 37; Emeline V. Lilburn, 36; George Washington, 35; William M. S., 33; Mary V. 25. Mrs. Lilburn lived in St. Mary's County, Maryland, and Elizabeth A. Early, Mary Victoria, Alice C., John S. and Isaac H. Hopkins lived with their uncle, George W. William M. S. and George Washington lived elsewhere in Washington. Mary subsequently married one Wailes, and Alice one James R. Hall.

Under the will, upon the arrival of Alice at the age of eighteen years the estate was to be divided, and in order to do this it seems to have been deemed advisable to sell the undivided moiety of the real estate. The other undivided moiety belonged to George W. Hopkins, and the trustees and executors, instead of selling one moiety, advertised and sold the whole interest in the property, as well that owned by

George W. as that owned by the estate. The advertisement bears date the 20th of April, 1864, and advertises the sale at public auction for the 10th of May following. This advertisement has already been set forth, and under it squares 95 and 96, known as "Hopkins' brick yard," were with the outfit advertised to be sold as a whole, as was also square 111 with the dwelling-house and other improvements. At the sale the trustees purchased the squares 95 and 96 at 4 cents per square foot; lot No. 1 in square 94 at 10 cents per square foot; and lots 16, 17, 19, 20, 22, and 39 in square 110 at $8\frac{1}{2}$ cents per square foot. George W. bought square 111 at 9 cents per square foot. These purchases were made through one James Chapman, who acted on behalf of the purchasers. Lot 6 in square 94 was sold to August Miller at 13 cents per square foot; lots 2, 3, and 4, at $10\frac{1}{2}$ cents; and lot 5 at 14 cents. Lots 8 and 9 in square 110 were sold to James L. Roche at 11 cents per square foot; lots 10 and 24 to Joseph Gawler at 10 cents; lots 36 and 37, with improvements, at $290 apiece; lots 41, 42, 43, and 44 to W. C. Longstreth at $6\frac{1}{2}$ cents per square foot. On May 20, 1864, the property in question was conveyed by the trustees to James Chapman, and he on the same day conveyed to George W. and John S. Hopkins the squares and lots purchased by them jointly, and to George W. the square purchased by him alone. The deeds were recorded November 16, 1864. The consideration in the conveyance to Chapman was merely nominal, one dollar, while the considerations in the deeds from him recite as paid by the grantees the price for which the property was purchased at the sale. On August 23, 1864, the orphans' court passed an order appointing September 13, 1864, as the time for the final settlement and distribution of the personal estate of the testator, and notifying his devisees and heirs to attend the court on that day. The copy of the order was published in accordance with the direction of the court in the National Intelligencer nine times, commencing August 24 and ending September 12, 1864.

It appears by the minutes of the court that on March 28, 1865, the register of wills reported to the court the first and final account of the executors, and the same was approved and

passed by the court, and it was ordered that "the executors aforesaid make distribution of the assets·in hand to the heirs in accordance with the provisions of the will of the deceased." This account treated the moiety of the proceeds of the sale of the real estate, including the sale of May, 1864, as partnership property to be accounted for in the orphans' court as personalty. In the account the executors charged themselves with the amount of the inventory, a policy of insurance, certain sums paid for slaves emancipated in the District, and some items of interest, etc. The debit account amounted to $24,155.59, and contained this item: "And with this amount, being one-half the earnings of firm of J. & G. W. Hopkins in conducting the brick kiln, owned in part by deceased, from the day of his death to date of rendering this account, first deducting the expenses of the family of deceased and other expenses, directed by the will of said deceased to be defrayed out of said earnings, and also the value of deceased's interest in said firm, as per affidavit filed with vouchers, $14,952.66." The credits amounted to $2024.13. No commissions were charged, and the balance shown was $22,131.46. This was followed by a distribution account, which, after deducting $8 fees from the balance $22,131.46, and $782.60 paid out on specific legacies, there was left $21,340.86, which was distributed among the eight surviving children of the decedent, namely: Isaac H. Hopkins, John S. Hopkins, Elizabeth A. Early, George W. Hopkins, William M. S. Hopkins, Emeline V. Lilburn, Mary V. Hopkins, and George W. and John S. Hopkins in trust for Alice C. Hopkins, being the sum of $2667.60¾ each. This account was filed and recorded March 28, 1865, and passed by order of court.

The affidavit and vouchers mentioned do not appear in the record, and it is said that after diligent search they cannot be found. Within a few days after the passage of the order distribution was made, and the receipts of the different parties entitled were delivered by the executors to the register and by him recorded. The share of William M. S. was receipted for by John S.; the share of Alice, receipted for by the executors, was by them held in trust until she attained the age of twenty-

one, and was afterwards paid to her and her husband. After the sale of May 10, 1864, George W. and John S. Hopkins carried on the brick-making business on squares Nos. 95 and 96, and lot 1, square 94, until as late as 1873, and probably as 1875, when George W. died. After his death John S. filed a bill for the partition of the property owned in common, the other lots purchased in common having been sold, and by the decree of the court below of February 27, 1877, lots 1, 2, 3, 4 and 6, in square 95, and lots 5, 6, 7, 8, 9 and 10 and 11 in square 96 were allotted to him in severalty. Lot 1 in square 94, and lot 5 in square 95, and lots 1, 2, 3, 4, 12, 13, 14, 15 and 16 in square 96, were allotted to the heirs of George W. Hopkins. Thereafterwards the children and heirs-at-law of George W. filed a bill for the payment of his debts and for a partition of the property allotted to them in the first suit, and also of square 111, where he resided until his death, and a decree was rendered in which a part of the property was sold for the payment of debts, and the remainder allotted to the heirs-at-law in severalty. Nearly all of the lots thus allotted had been sold when the bill in this case was filed. John S. Hopkins, the other trustee, died intestate May 7, 1883. He left a widow, Esther E. Hopkins, and an only child and heir-at-law, Bertha Hopkins, who was at that time 25 years of age. After the partition between John S. and the heirs-at-law of George W., John S. built a row of houses on the lots in square 96 at a considerable cost. None of the property allotted to him in the partition suit was sold by him prior to his death, except the east part of square 95.

As already stated, George W. and John Hopkins in 1846 carried on their business on square 67, and in 1869, after the death of John Hopkins, a deed was made by Charles E. Mix to George W. Hopkins and John S., as executors and trustees, for lots 3, 4 and 5 in said square. These lots were sold and conveyed by the executors and trustees, June 18, 1872, for $6784, and of these proceeds George W. received one-half as copartner, or $3392, and the other half was paid over to the beneficiaries entitled, who duly receipted for their respective shares in full of all demands to date. The share of George

Washington Hopkins was receipted for by Mary A. Hopkins, his administratrix.

June 20, 1860, William M. S. conveyed in fee simple all his interest in his father's estate to his brother John S. for the consideration, as expressed in the deed, of $3000. This deed was also signed by Sarah E. Hopkins, the wife of the grantor, and was acknowledged on the day of its date by the grantor and his wife before two justices of the peace, and recorded July 7, 1860. By deed dated January 28, and acknowledged and recorded January 29, 1864, William M. S. conveyed the same share, with all his property, to Christopher Ingle, in trust for his wife for life, and then over to his children and himself.

*Mr. Walter D. Davidge*, and *Mr. George F. Edmunds* for appellants. *Mr. Sidney T. Thomas* and *Mr. Henry Wise Garnett* were with them on the brief.

*Mr. Samuel L. Phillips* and *Mr. Samuel Shellabarger* (with whom were *Mr. John J. Johnson* and *Mr. J. M. Wilson* on the brief) for appellees. The case was argued mainly on the facts. The following points of law were made in appellees' brief.

Long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be excused except by showing some actual hindrance or impediment caused by the fraud or concealment of the party in possession, which will appeal to the conscience of the chancellor. *Lansdale* v. *Smith*, 106 U. S. 391.

Without reference to any statute of limitations the courts have adopted the principle that the delay which will defeat a recovery must depend upon the particular circumstances of each case. *Harwood* v. *Railroad Company*, 17 Wall. 78.

The party who makes such appeal should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim, how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance, and how and when he first came to a knowledge of the matters alleged in his bill. *Badger* v. *Badger*, 2 Wall. 87.

It is a principle of law, as well as of natural justice, that greater consideration and care are due to persons known to be unable to take care of themselves, than to those who are fully able to do so. *Graffam* v. *Burgess*, 117 U. S. 180.

The office of trustee is important to the community at large, and frequently most so to those least able to take care of themselves. It is one of confidence. The law regards the incumbent with jealous scrutiny, and frowns sternly at the slightest attempt to pervert his powers and duties for his own benefit. *Railroad Company* v. *Durant*, 95 U. S. 576.

These trustees knew the value of subdivision in securing good prices at the sale, and nevertheless sold square 111 as a whole. Such conduct between trustee and *cestui que trust* reaches far beyond what was necessary to be proved in this case in order to set the sales aside. When this relation subsists, the slightest obliquity, the slightest indirection is adequate, on grounds of public policy. *Villa* v. *Rodriguez*, 12 Wall. 323; *Shaw* v. *Railroad Co.*, 100 U. S. 605. Reasonable certainty is all that is necessary in case of fraud. *Kempner* v. *Churchill*, 8 Wall. 362; *Neale* v. *Neales*, 9 Wall. 1; *Rea* v. *Missouri*, 17 Wall. 532; *Graffam* v. *Burgess*, 117 U. S. 180.

It was the duty of the trustees in making the sale to exercise that diligence and caution which a careful and prudent owner would observe in the sale of his own property. If the sale be made under circumstances of haste and imprudence, or if the trustees fail in reasonable diligence in inviting competition, or adopt an injudicious and disadvantageous mode of selling the property, a court of equity ought not to ratify the sale. *Gould* v. *Chappell*, 42 Maryland, 466; *Ord* v. *Noel*, 5 Madd. 438; *Harper* v. *Hayes*, 2 Gif. 210; *Turner* v. *Harvey*, 1 Jacob, 169; *Bridger* v. *Rice*, 1 Jac. & Walk. 73; *Mortlock* v. *Buller*, 10 Ves. 292; *White* v. *Cuddon*, 8 Cl. & Fin. 766.

Although the rule of law, as now firmly settled, is that a trustee may buy of his *cestui que trust*, provided there is a distinct and clear contract to that effect, made under such circumstances as indicate that the *cestui que trust* was aware of the correct value of the property, that the trustee had no

special knowledge of the value of the thing bought, which was not also possessed by the beneficiary, and that no undue influence arising out of the trusteeship was brought to bear on the mind of the *cestui que trust* — in a word, that they stood at such length to each other as amicable buyer and seller sustain ordinarily one to the other; yet it has been as distinctly decided that the relaxation does not extend to a purchase by a trustee at his own sale. Such a sale is *ipso facto* voidable by the *cestui que. trust*, on ground of public policy. Lewin on Trusts, 438; *Michoud* v. *Girod*, 4 How. 503.

Fullness of price, absence of fraud, and fairness of sale are not sufficient to countervail this rule of policy. *Armstrong* v. *Huston*, 8 Ohio, 552; *Ricketts* v. *Whittington*, 15 Maryland, 46; *Jamison* v. *Glascock*, 29 Missouri, 191; *Woodruff* v. *Cook*, 2 Edw. Ch. 259; *Spindler* v. *Atkinson*, 3 Maryland, 409; *S. C.* 56 Am. Dec. 755.

The theory of the defence is that these *cestuis que trustent* are guilty of laches in not investigating and discovering these frauds. They assert in their answers and attempt to prove in their evidence there was no fraud, and although asserting this innocency, they claim negligence for not finding out what they say did not exist. But the law is that the office of trustee is an important one — an office of trust and confidence; one in which the weak and incompetent may find shelter and protection. It is the duty of the trustee to execute the trust, and it is not the duty of the *cestui que trust* to make any inquiries. *Taylor* v. *Taylor*, 8 How. 183, 200; *Dresser* v. *Missouri & Iowa Railway Construction Co.*, 93 U. S. 92; *Graffam* v. *Burgess, ubi sup.; Dorsey* v. *Packwood*, 12 How. 126, 131; *Villa* v. *Rodriguez, ubi sup.; Allore* v. *Jewell*, 94 U. S. 506, 512; *Zeller* v. *Eckert*, 4 How. 288, 295.

It is sought to prove a consent by the *cestuis que trustent* to the purchaser by the trustees. But the alleged consent was not such a consent as the law contemplates. The *cestuis que trustent* were merely passive, and such an action is not consent, as expressly decided by the Supreme Court of Pennsylvania in the case of *Paul* v. *Squibb*, 12 Penn. St. 296. Confirma-

tion must be a solemn and deliberate act, Lewin on Trusts, 450; no *suggestio falsi*, no *suppressio veri:* and not fished out from loose expressions. *Carpenter* v. *Heriot*, 1 Eden, 338.

No laches can be claimed by reason of the relationship between the parties: no acquiescence or ratification of illegal or unlawful acts, spelt out by the most equivocal and uncertain testimony of more equivocal and uncertain acts testified to. *Kennedy* v. *Kennedy*, 2 Alabama, 571; *Boney* v. *Hollingsworth*, 23 Alabama, 690; *Sears* v. *Shafer*, 2 Selden, (6 N. Y.) 268; *Michoud* v. *Girod, ubi sup.; Brooks* v. *Martin*, 2 Wall. 70.

The settlement in the orphans' court was no estoppel. That court had no jurisdiction over the distribution of equitable assets or real estate. *Robertson* v. *Pickrell*, 109 U. S. 608. The interest of John Hopkins in these squares was real estate.

Nor was the receipt of the distributive share allowed in the settlement an estoppel. *Embry* v. *Palmer*, 107 U. S. 3; *Michoud* v. *Girod, ubi sup.*

The plaintiff, Sarah E. Hopkins, being a married woman, no laches can be charged against her. *House* v. *Mullen*, 22 Wall. 42.

These sales being fraudulent, a court of equity will not allow the trustees or their heirs to reap any advantage from their scheme, but will set the sales aside *ab initio*, and hold them to an account for the profits which they have made — doing equity, however, to them, which they refused to others, in allowing them credit for their lawful expenditures, as improvements, taxes and payments to the appellees with interest thereon. *Oliver* v. *Piatt*, 3 How. 333, 401.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

This bill was filed April 8, 1884, and attacked the purchases through Chapman at the sale of May 10, 1864, and the account stated and settled in the orphans' court March 28, 1865; the settlement made in 1873 of the proceeds of the sales of lots 3, 4 and 5 in square 67; and also the deed from William M. S. Hopkins and wife to John S. Hopkins of June 20, 1860. The

executors and trustees of John Hopkins; James Chapman, who purchased at the sale; Isaac and George Washington Hopkins, two of the sons and devisees of John Hopkins, and who were present at the sale, were all dead; the affidavits and vouchers filed in the orphans' court at the executors' settlement could not be found; partition had been had by judicial proceedings between one of the trustees and the heirs at law of the other, and also between the latter; and great changes had taken place in the quarter of the city where the lots and squares were located, coupled with an enormous increase in their value, in the lapse of twenty years, and because of the improvements which had in the meantime been made in their vicinity.

No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred. The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible. Each case must necessarily be governed by its own circumstances, since, though the lapse of a few years may be sufficient to defeat the action in one case, a longer period may be held requisite in another, dependent upon the situation of the parties, the extent of their knowledge or means of information, great changes in values, the want of probable grounds for the imputation of intentional fraud, the destruction of specific testimony, the absence of any reasonable impediment or hindrance to the assertion of the alleged rights, and the like. *Marsh* v. *Whitmore*, 21 Wall. 178; *Landsdale* v. *Smith*, 106 U. S. 391; *Norris* v. *Haggin*, 136 U. S. 386; *Mackall* v. *Casilear*, 137 U. S. 556; *Hanner* v. *Moulton*, 138 U. S. 486.

The main contention here is that the sale of May 10, 1864, should be set aside as to the purchases by the trustees through

Chapman, on the ground of constructive, coupled with actual, fraud.

Undoubtedly the doctrine is established that a trustee cannot purchase or deal in the trust property for his own benefit or on his own behalf, directly or indirectly. But such a purchase is not absolutely void. It is only voidable, and as it may be confirmed by the parties interested, directly, so it may be by long acquiescence or the absence of an election to avoid the conveyance within a reasonable time after the facts come to the knowledge of the *cestui que trust*.

The often cited case of *Michoud* v. *Girod*, 4 How. 503, laid down the general rule that a person cannot purchase legally on his own account that which his duty or trust requires him to sell for another, nor purchase on account of another that which he sells on his own account, and that a purchase, *per interpositam personam*, by a trustee or agent of the particular property of which he has the sale, or in which he represents another, whether he has an interest in it or not, carries fraud on the face of it; but there was actual fraud in that case, and the rule that within what time a constructive trust will be barred must depend upon the circumstances was recognized. In *Stearns* v. *Page*, 7 How. 819, 829, Mr. Justice Grier, speaking for the court, said that a complainant, seeking the aid of a court of chancery under such circumstances of lapse of time as there existed, "must state in his bill distinctly the particular act of fraud, misrepresentation, or concealment — must specify how, when, and in what manner it was perpetrated. The charges must be definite and reasonably certain, capable of proof, and clearly proved. If a mistake is alleged, it must be stated with precision, and made apparent, so that the court may rectify it with a feeling of certainty that they are not committing another, and perhaps greater, mistake. And especially must there be distinct averments as to the time when the fraud, mistake, concealment or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether, by the exercise of ordinary diligence, the discovery might not have been before made. Every case must, of course, depend on its own peculiar circumstances, and there

would be little profit in referring to the very numerous cases to be found in the books on this subject. In the case of *Michoud* v. *Girod*, 4 How. 503, lately decided in this court, transactions were investigated after a lapse of more than twenty years; but the facts proving the fraud were all on record, and were not disputed. The false accounts made out against the estate of the deceased by the executors were on file, and their iniquity was apparent on their face. Moreover, the complainants resided in Europe and were kept in ignorance of their rights, and hindered from prosecuting them by the promises, threats and fraud of the guilty parties."

And in *Badger* v. *Badger*, 2 Wall. 87, 95, the same eminent judge observed that a party seeking to avoid laches "'should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim; how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance; and how and when he first came to a knowledge of the matters alleged in his bill; otherwise the chancellor may justly refuse to consider his case, on his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer.'"

It is conceded that the proposition that where a trustee or person, acting for others, sells the trust estate and becomes himself interested in the purchase, the *cestuis que trust* are entitled as of course to have the purchase set aside, is subject to the qualification that the application for such relief must be made within a reasonable time, and that laches and long acquiescence cannot be excused except by showing some actual hindrance or impediment caused by the fraud or concealment of the party in possession, which will appeal to the conscience of the chancellor. But it is argued that such fraud and concealment existed here, and in that connection assertions and insinuations of fraud in fact are made.

Appellees' counsel contend that, although George W. Hopkins and John S. Hopkins were men of character and integrity, yet they were good business men, and that John S. was self-reliant, reticent and close in money matters, while the four

daughters were unaccustomed to business, and of the other three sons, two were dissipated and one lacked business capacity; that the family was a united one, and entire confidence was reposed in the uncle and brother, and hence the trustees might easily have cheated their *cestuis que trust:*

That the trustees had full knowledge of the future value of the property and desired to possess themselves of it at the lowest possible price, and, therefore, determined not to divide by partition, but to sell; and purposely sold at a time when the real estate market was prostrated and the building business so depressed that there was no demand for bricks, notwithstanding they had ample power to change the time of sale if circumstances rendered it necessary or desirable; and advertised and sold squares 95 and 96 as a brick yard as a means of reducing the price, although the property was worthless as a brick yard and there was no demand for bricks, or for real estate in large quantities; and that these squares were sold as an entirety in order to enable the trustees to buy at a less price than a sale by subdivision would have produced, and in this way a loss occurred of not less than $15,930.87; that square 111 was sold as an entirety, when it should have been sold in lots, and this resulted in a loss of $6061.98; that the difference between what these squares actually realized and what they should have, was not less than $22,092.85, or a loss to the eight heirs of John Hopkins of $11,046.42½:

That "these were frauds prepetrated secretly under such circumstances of confidence inspired by the trustees, as to prevent these owners from discovering them," and this is alleged to be established; (*a*) By the employment of Chapman to make the purchase; (*b*) by the deed to Chapman reciting a consideration of one dollar, and the deed of Chapman to George W. Hopkins, "having the false recital" that Chapman had sold him square 111 for $9093.42, and that to George W. and John S., "having the false recital" that Chapman had sold to them squares 95 and 96, and parts of 94 and 110, for $10,842.24; (*c*) by the fact that the deeds were not recorded until November 16, 1864:

That in order to "give a semblance of judicial sanction to

their acts and further deceive appellees," the trustees went into the orphans' court, and by *ex parte* proceedings had their account passed upon, although the court had no jurisdiction:

And further, that appellees were ignorant of the purchase of the property by the trustees until so informed by their attorney a few days before the institution of this suit; that it had been represented to them that a bricklayer had bought it, of whom their uncle and brother had subsequently purchased; and that it was represented to them by the trustees that the sale was *bona fide*, and that the property had brought all it was worth at the time. It is insisted that the evidence discloses an actual hindrance and impediment to the appellees' discovering their rights, caused by the fraudulent assertions of the trustees that the property brought its full price, and that the sale was particularly conducted for the interest of the heirs. And it is earnestly urged that when the confidential relation of trusteeship and kinship exists, if the trustees and kinsmen inform those for whom they act that their administration has been honest and faithful, when that is not the fact, that constitutes such fraudulent concealment as excuses laches.

It will be perceived that the main charge of fraud in fact consists in an alleged conspiracy to obtain the property for less than it was worth. The claims that the sale was fixed at an unpropitious time and that the squares should have been subdivided and sold in lots, go to the adequacy of the price. If there were no such conspiracy, the specific charge falls to the ground, and if all the circumstances relied on to sustain it were actually known or the appellees were chargeable with such knowledge, then it comes too late. And if they were fully informed that the trustees purchased, and the latter made no false representations in relation to the sale, which misled them, the attempted explanation of the lapse of time as bearing on the purchase by the trustees themselves also fails.

We can hardly see how appellees can now be permitted to plead ignorance as to the time and manner of the sale, the prices brought, the deeds to and from Chapman, and the settlement of the account. And if they are held to knowledge

on these points, the question in either aspect becomes reduced to the inquiry whether they knew or might have known that the trustees purchased the property, or were kept in ignorance by any false representations. But in answering this inquiry it is perhaps desirable to look somewhat into the basis of these charges.

We do not understand it to be contended that the trustees were bound to carry the John Hopkins half, or attend to the support of his children, or any of them, out of the brick business or otherwise, indefinitely.

By his will, after certain bequests, John Hopkins had devised his property to his brother and son in trust, " to carry on the brick-making business as now conducted by my said brother George W. Hopkins and myself in Washington City, D. C., said business to be under the direction of my said brother, George W. Hopkins, assisted by my said son, John S. Hopkins, as clerk, for which he is to receive a regular stated salary;" and further, to receive the income of the estate, and business or the testator's portion, and apply the same to the payment of his debts and funeral expenses; of a reasonable salary to John S. Hopkins, as clerk; and the reasonable expenses and support of the testator's family and the education of the younger members thereof. " And upon further trust, that my said trustees shall (where, in their judgment a sale of the real property owned by me and my said brother, George W. Hopkins, or any part thereof, or of the brick-kilns and the materials or implements thereunto belonging, or of said business, is essential or necessary for any cause whatever or would be advantageous) sell and dispose of at public or private sale, at such time or times after such notice and upon such terms as they may deem most for the interest of my estate, and by proper conveyances convey the same to the purchasers, who, having paid his or her purchase money to my said executors, shall be under no obligation to see to the application thereof under the trust of this, my will, nor answerable for the misapplication of the same." Surplus income and proceeds of sales were to be reinvested, or advanced to such of the children as might need or deserve the same. And the will further pro-

vided " that upon the arrival of my daughter Alice to the age of eighteen years, which will occur on or about the first day of May, 1864, my estate of every kind shall be divided by my said trustees and executors among my children.".

But the trustees were invested with power to make an earlier disposition in their discretion, as above shown, and by the further clause: ·

"I greatly desire, as already stated, that my family shall remain as it now is, without change or modification or sale or valuation of the furniture or slaves until the said division of my estate, and that it shall until then be supported by the brick-kiln business as though I were living, and as I believe the squares and lots of ground owned by my brother George and myself, is now and will continue to increase in value, I desire, if possible, that said land may be kept unsold and undivided until as above stated, as it will thus be greatly to the advantage of my family ; but as circumstances, now unforeseen, may make a change necessary or desirable, I cheerfully trust in the prudence and discretion of my said trustees, and I give them full power as above to exercise their judgment as circumstances may arise, making it proper to dispose of said land and business, or to change and alter the same, believing that they will have the comfort and welfare of my family and their relatives much at heart."

. It is unnecessary to consider the rights and powers of George W. Hopkins as surviving partner. The trust was accepted, the business carried on, the children assisted and supported, and the land kept unsold and undivided, (except certain lots in square 110, which were disposed of in 1859,) " until as above stated," that is, until Alice attained the age of eighteen, which was April 13, 1864, when it became the duty of the trustees to divide the testator's estate of every kind among his children.

To divide this real estate required a partition as between George W. and the estate, and thereupon a partition of their half as between the testator's children. To sell an undivided half would probably prove disadvantageous, but if George W allowed his half to be sold with the other so that complete title could be given without subsequent legal proceedings, the

trustees apparently concluded a sale would be the best mode of arriving at a division. It is impossible to say that there was anything unreasonable in such a conclusion.

There is nothing, then, in the trustees dividing at the time specified by the testator, and resolving to do this by the ordinary method of a sale, which gives color to the charge of conspiracy.

Squares 95, 96 and part of 94 were used in the brick business, and George W. Hopkins lived on square 111. He owned one-half of these squares, and it was natural that he should desire to own the whole of his homestead, and that he and his nephew should wish to own all that portion used in the business in which they were engaged. But it is not, therefore, to be assumed that in the gratification of their wishes in this regard they would commit deliberate fraud upon the brothers and sisters of the one and the nephews and nieces of the other. It is not denied that George W. and John S. Hopkins were honest and reliable and sustained a high reputation for integrity; and if fraud or breach of trust ought not lightly to be imputed to the living, the evidence of fraud should be convincing before the sanctity of the grave is disturbed. Yet here the stress of the argument that the deceased were guilty is thrown upon the alleged inadequacy of price claimed to have been the result of selling squares 95 and 96 as an entirety and square 111 in the same way. That they brought full prices as squares is satisfactorily established by the evidence, and scarcely disputed.

The condition of the squares in that part of the city, including squares 94, 95, 96, 110, and 111, in May, 1864, is described by one of appellees' witnesses as just laid out "in old fields, as it were; you could hardly tell one street from another. Very rarely you would see any improvement on any of them, unless it were some old shanty which had been built there probably thirty or forty years. . . . All these squares were pretty much set out in nurseries, you will remember, but I do not think any nurseries were on these squares at that time. I think they laid out in a common. Q. Were the streets graded? A. I think not; I do not think there were

any streets graded there.   Q.  How many houses can you rec-
ollect in the neighborhood of what is now known as Dupont
Circle ?   A.  There were very few houses in that neighborhood.
I want to state that there were very few.   George Hopkins's
house was there at the time, but houses were very scarce, I tell
you.   There may have been some old. landmarks torn away
that may have escaped my memory, but the whole place laid
out in old fields and commons.   I cannot recall any houses,
but farther out, near the boundary, there were some houses.
I remember a house right at the head of Twentieth Street.   It
is there still.   Well, they were scattered around; probably you
would have to walk two or three squares to find houses.
Q.  Were there any pathways to get to the houses ?   A.  I
think there was a road which led to Holmead's burying
ground, a kind of highway known as the burying-ground
road.  I went out that road when I was in that part of the
city ; but, as for squares, I do not think anybody could tell
one square from another by going there, so far as distinguish-
ing them by roads or anything of that kind is concerned."

Other evidence is to the effect that in 1866 and 1867 there
were no streets open running north of K and west of Four-
teenth Streets except Twentieth Street; that no street had been
brought. to anything like an established grade at that time,
though Twentieth Street was graded a portion of, and perhaps
all, the way; that none of the streets running east and west
were opened in that locality west of Seventeenth or Eighteenth
Streets except a portion of L Street; that no streets north of
L Street were opened on any established grade across Twen-
-tieth Street ; that M Street was very nearly on the grade about
Twentieth Street, but not at Twenty-first Street ; that there
were scarcely any blocks or any of the streets opened north of
L and west of Fourteenth Streets in that portion of the city in
1867, and Massachusetts Avenue had not been opened, nor
P, nor O Streets ; that the property in that section of the city
west of Dupont Circle, " a good deal of it, or some of it, was
enclosed and used for cultivation, for pasturage; a portion of
it was used for the manufacture of brick, and other portions
were laid out in pasturage for hogs and cows and goats, etc.

. . . A person could tell about where the streets were, but not by any defined lines. There were roads passing here and there up Massachusetts Avenue, which was barely passable. There was no bridge over Slash Run at Massachusetts Avenue." There were no water mains nor sewers. Brick kilns were on square 95, and sheds and yards for drying bricks were on square 96. The surface of the squares was rough and irregular and full of holes made in digging for brick clay. One witness said that in the middle of those squares " you might have buried 'Jumbo,' and you could not see him." How far the squares might be above grade when the streets were opened seems to have been regarded as in doubt, notwithstanding the books of the surveyor's office gave the future grades.

It was in proof that the manufacture of brick was carried on there " until 1872 or 1873 ; " and that square 96 was " used for digging clay for the manufacture of brick, in 1867, 1868, and 1869, along about that time." The principal witnesses concur that the business of brick making was carried on after the sale as it had been before.

Evidence was adduced on behalf of appellees tending to show that there was but little brick clay on these squares after 1864 ; that the concern gathered it from the streets ; that the two kilns on square 95 were old and out of shape ; and that the brick the Hopkins made was too soft for pavements. But the fact remains that the brick business was carried on upon these squares for years after the sale. They were thus advertised as a " brick yard, believed to be one of the best located in the District, having both Washington and Georgetown for a market, an abundance of fine clay, brick and tempering sheds, kilns, offices and all necessary outfit for a first-class brick yard."

There is evidence of probable ground for the belief that the squares would in any view bring better prices by being sold in blocks ; but apart from that, we think the inference of bad faith because they were sold as a brick yard, a strained one. Conceding that the judgment of the trustees was influenced by their own intention to continue the business, that is not enough to sustain the assumption of actual fraud in the matter

of the prices. And the knowledge of the parties now complaining, of the continuance of the business, is admitted. So, as to square 111, that was advertised as "improved by a large brick dwelling-house and back buildings, carriage-houses, stabling, etc., the whole enclosed and beautified with fruit and ornamental trees and shrubbery."

The reason is thus given for selling it as an entirety, and it was an obvious one. As we have said, it was George W. Hopkins's home, and most of the children of his brother John were living there with him. He naturally desired to own it, not for subdivision, but for a residence. The house is shown not to have materially enhanced the value; and the price of nine cents per square foot was a full price. Several years after he did subdivide a part of this square, and sold the lots constituting the north half for eleven cents per square foot. This was nearly five years after the sale. The first subdivision of six of the original lots was August 6, 1868, and the second, of the remaining six, was November 7, 1870.

The Board of Public Works created by the act of Congress of February 21, 1871, thereafterwards opened up and reclaimed the territory in this quarter of the city, and many thousands of dollars were imposed in special assessments upon all this property and paid by the owners. The property had increased in value between its original purchase and the sale to a considerable extent, as the prices at the sale showed, but twenty years thereafter these values had increased several thousand per cent. Square 96 was not subdivided until October 20, 1877, more than thirteen years after the sale.

Undoubtedly the argument is ingenious and forcible, that squares 94, 95 and 96 were of about the same value, and that if the lots in square 94 brought a higher price per square foot, the lots in the other squares, if subdivided, would have done so also; but considerable differences between square 94 and the others are shown, and it appears that the five lots in 94, purchased at the sale by August Miller, were then occupied by him as a garden; and upon the issue of fraud in fact an intentional attempt to acquire the property at an inadequate price cannot safely be inferred upon equivocal and conflicting

theories as to why one piece sold at a better price than another. Taking all the evidence together, even if it were now seen that if the brick business had been abandoned and the property subdivided, more might have been realized, fraud is not to be imputed because this was not done.

No exception seems to be taken for want of publicity in the sale. The advertisement was published in the National Intelligencer, the Evening Star and the Daily Chronicle from April 20, 1864, to May 10, 1864, daily. The sale was conducted by J. C. McGuire & Co., an established firm in the conduct of such sales in 1864, and apparently by Thomas J. Fisher, then a member of the firm, who, however, by reason of the lapse of time and through the distractions of a large business, testified that he did not have the slightest recollection of making it. The proofs indicate that there were many persons present and more than one bid, perhaps three. An account of the sale to Chapman and others and the prices realized appeared in the Star the next evening.

The deeds to Chapman were for a nominal consideration, while the consideration in each of the deeds from Chapman to George W. and John S. jointly, and to George W., was the aggregate amount for which Chapman had bid in the property described in the deeds respectively. They were all simultaneously recorded on the 16th of November following, and spoke for themselves, carrying upon their face the evidence of the transaction as being a purchase by the trustees through Chapman. Thus viewed, their recitals were not false. If the consideration in the deed to Chapman had been the amount of his bids there would have been more ground for such a suggestion. It was the trustees who paid, and the deeds showed it according to the fact. The delay in recording the deeds is of no moment. If the evidence shows, as we think it does, that the purchase was openly announced in the family of George W. and John, it would be unreasonable to ascribe to them the motive of concealment in neglecting to record the deeds before they did. The argument as to confidence reposed is inconsistent with such an idea, and meditated fraud would have put the conveyances on record at once.

It is said that the accounting in the orphans' court was had in order to "further deceive appellees." We find that on the 12th of July, 1864, citation was issued against the executors to settle an account, and that on the 23d of August the court appointed the 13th of the succeeding September for the final settlement and distribution of the personal estate of the deceased, and issued the requisite legal order for publication to be inserted once a week for three weeks in the National Intelligencer prior to said day, which was accordingly done. No proceedings took place on September 13, 1864, and on January 7, 1865, another citation was ordered to be issued against George W. Hopkins, which was, however, as was the first one, returned without service. On March 28 the accounting was had, as hereinbefore stated. Perhaps there was undue delay in this accounting, but the proceedings in court were regularly conducted and the shares of the devisees ascertained and duly receipted for by them. The account shows that the proceeds of the business and of the sales prior to May 10, 1864, were included, though not itemized; and it is certainly too late to open up that account as such, and especially in the absence of evidence of any fraudulent charges or omissions. Indeed, the account can hardly be said to be attacked on any ground inherent in itself, but simply in order to obviate its operation as a settlement, precluding any further investigation of the matters complained of. The executors accounted for half the proceeds from the sale as personalty, treating the real estate as having been acquired and used for partnership purposes and as being partnership property. We are at a loss to conceive how the conspiracy charged is sustained in any degree by the mere fact that the executors accounted.

It appears also that after the conveyance by Chapman to George W. and John S. Hopkins as individuals, they conveyed, between July 26, 1865, and March 4, 1871, by four separate deeds, lots 16, 19, 39 and 17, in square 110, to different purchasers, and that the first, second and fourth of these purported to be given by them as executors, while the third did not. These deeds were drawn by the same scrivener who had been in the habit of preparing deeds for George W. and

John S. Hopkins, as executors, before the sale. Between the dates of the first and last of these four deeds, George W. Hopkins, as an individual, conveyed a number of lots in square 111, in which John S. Hopkins did not join, and between the date of the fourth deed and April 30, 1875, George W. and John S. Hopkins, as individuals, conveyed by four separate deeds, at different times, four lots in square 110 to different purchasers, while George W. Hopkins between the same dates conveyed a number of lots in square 111. We think the form of the three deeds was obviously a blunder of the conveyancer, and that it cannot rightly be laid hold of as showing that the deeds were intentionally so drawn to conceal the fact that George W. and John S. Hopkins owned the property therein named as individuals, or that they purposely, for that reason, continued to deal with portions of the real estate they had purchased, as if they still held it as executors and trustees.

We are brought, then, to consider whether appellees were ignorant of the purchase of the property by the trustees, and whether there were any false representations on their part which misled them.

George Washington Hopkins and Isaac H. Hopkins were at the sale, and Mrs. Lilburn, Mrs. Wailes, Mrs. Early and Alice were at the house of George W. at the time it took place, Mrs. Lilburn having been sent for to come up. The National Intelligencer was taken at the house, and the advertisement had been read, certainly, by Mrs. Early, some time before. George Washington said to a witness, while Chapman was bidding: "He is buying for Uncle George;" and Isaac H. was "the first to come in from the sale; and he said that Chapman had bought the property for Uncle George W. Hopkins and John, and he said they had paid as much for it as the property was worth." The subject of the sale, and that George W. and John S. would purchase, was frequently talked over as well before as after the sale, and the evidence demonstrates that there was no secrecy or concealment about it.

The interesting fact is testified to by appellees' solicitor that

he brought to the attention of his clients the case of *Landsdale* v. *Smith*, 106 U. S. 391, and that he "read to them the rule of law that, in order to excuse long delay in the prosecution of a suit, it must be shown by the plaintiff that the delay was caused by some hindrance, impediment or concealment of a party in possession. I think I read it over to them half a dozen times and tried to explain it to them." In that case it is stated: "It has been a recognized doctrine of courts in equity, from the very beginning of their jurisdiction, to withhold relief from those who have delayed for an unreasonable length of time in asserting their claims. In *Wagner* v. *Baird*, 7 How. 234, 258, it was said that 'long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be excused but by showing some actual hindrance or impediment, caused by the fraud or concealment of the party in possession, which will appeal to the conscience of the chancellor.'"

Nevertheless, although thus admonished, the testimony of the four sisters, Mrs. Early, Mrs. Lilburn, Mrs. Wailes, and Mrs. Hall, (who appeared to be intelligent and well educated,) if treated as competent, falls far short of overthrowing the evidence on the part of the defendants that they were acquainted with the fact that the purchase was made for the trustees. No one can carefully peruse their evidence without being impressed with the belief that they were aware of that fact. Three of them testified that they knew their uncle and brother had become purchasers of the property from a bricklayer, or Chapman, who bought at the sale, not that they did not know or hear that he bought for the trustees. Mrs. Hall, who was but just eighteen at the time, denied that she knew who bought the property until March, 1884, but said that she had no doubt that if she had applied to her uncle or brother for information in regard to the estate they would have given it. Mr. Luttrell testifies that in 1876 she told him that Chapman bought for George W. and John S., and in 1867 and 1868 she, or her husband for her, received and receipted for the full amount of her share, (which under the will was not to be paid over until she reached twenty-one,) on an account rendered. All these

complainants saw the brick yard being carried on as before, and George W. and John S. continuing to exercise acts of ownership over the property. They all had no doubt that either of the trustees would have given them any information they desired, and they all evidently had no objection to the trustees' becoming the purchasers in and of itself.

The following is from the testimony of Mrs. Early:

" Q. I understand you now to say that you would not have objected to George W. and John S. Hopkins buying the property had they given a fair price for it? A. No, sir; I would not have objected to it. Q. And your whole complaint is that you were told they did not give a fair price for it? A. That justice was not done us. Q. I understand your complaint now is that George W. and John S. Hopkins did not give a fair price for what they bought? A. Well, I think they got as much as they could for the sale at the time. Q. You had no objection, as you stated yesterday, to George W. and John S. Hopkins buying it? A. No, sir. Q. And you did not care who bought the property so that you got a fair price for it? A. No, sir."

The force of this admission is attempted to be broken by a letter to Mrs. Early from her attorneys, calling her attention to her answer as to the trustees getting as much as they could at the time, and among other things notifying her "that unless this statement was a mistake, honestly made, and as honestly corrected, we shall feel obliged to ask the court when the case shall be called for hearing, to consider us as no longer counsel for your interest;" and her reply that she meant " what I thought the day of the sale, but since then I do not think they got as much as they could for the property," etc. This correspondence may have soothed the susceptibilities of counsel, but it is not evidence, and if it were, it fails to remove the impression that Mrs. Early believed that a full price was realized.

It will subserve no useful purpose to go more minutely into the evidence. We regard the conclusion as irresistible, that the fact that the purchase was made for and by the trustees was known to all of these children at or about the time of the sale.

The excuses for want of diligence in the premises set forth in the bill amount only to this — that in February, 1884, an attorney undertaking the investigation of William's case, which had been in hand since 1873, " discovered for the first time that Chapman had never paid one dollar of consideration for said land, but had bought the same for and on account of said trustees, and that the sale was fraudulent and void;" and that thereupon the plaintiffs' attention was called to this so-called discovery. The point seems to be that complainants' counsel concluded from the conveyances, as he very well might, that the trustees had bought at their own sale. This was true, and was an obvious deduction from the deeds, but it did not therefore follow that those conveyances were absolutely void, nor that they could be held so nineteen years after they were executed, if the complainants had known or should have known that fact during the intervening time, or a large part of it.

Whether appellees were informed, before 1884, of the rule in relation to trustees purchasing at their own sale, is immaterial. Probably George W. and John S. Hopkins were unacquainted with it, and made the purchase through Chapman because obliged to in order to pass the legal title. The vital question is, Did appellees actually know, or were they chargeable with knowledge of, the fact of the purchase itself? What we have said in effect disposes of the suggestion that by false representations appellees were misled into believing that the sale was fairly conducted when it was not, and that this constitutes a sufficient explanation of the lapse of time.

The bill averred that George W. Hopkins assured Mrs. Lilburn, when she expressed surprise that the property had brought so low a price, that the sales were " each and all *bona fide.*" But the testimony of Mrs. Lilburn was not quite that. She testified that when her uncle came in from the sale, she remarked to him: " ' Uncle George, is the land all sold?' He said: ' Yes.' I said: ' You did not get but very little for it.' He said: ' No; it was a *bona fide* sale.' " In addition to this, counsel refer to the evidence of Mrs. Dashiell on cross-examination, where she said that she understood the property

brought its full value, and a great many people thought it brought more, and was asked: "Q. It was looked upon, then, as a sale particularly conducted for the interests of the heirs? A. Yes, sir; it was;" and of the widow of John S. Hopkins, that, "My uncle, George W. Hopkins, and my husband, John S. Hopkins, told the family that they were going to buy the brick-yard property; that they would give as much for it as any one else; and none of them objected at all;" and that of other witnesses, that there was no dissatisfaction expressed and no suspicion entertained.

Upon testimony of this kind, we cannot hold that either of these deceased trustees made statements with the view to induce their *cestuis que trust* to act upon them, or that appellees were lulled into repose by any affirmative conduct on their part. Still less does this class of evidence tend to show an effort to conceal from appellees that the trustees had purchased at their own sale.

By the amendment made in June, 1885, these trustees were charged with fraudulently appropriating one-half of the proceeds of lots 3, 4 and 5 of square 67, known as the Mix lots, to the benefit of one of them. The evidence showed that John and George W. Hopkins carried on the business of brick-making on square 67, using the clay derived therefrom, before they occupied squares 94, 95 and 96, and that the brick business had been carried on on that square, before their occupancy, by a firm, one of whom was named Mix. It further appeared that John Hopkins had been engaged in business on his individual account and had failed, and that he had had transactions in which George W. was not interested. And one of his daughters, Mrs. Early, testified, under objection, to a conversation between her father, John Hopkins, shortly before his death, and Mr. Mix; in which Mix told Hopkins that he would give him a deed for some lots. On October 27, 1869, Charles E. Mix and wife, for the nominal consideration of $5, conveyed to George W. and John S. lots 3, 4 and 5 in square 67 in fee simple, "in trust, nevertheless, to have and to hold the same for the benefit of the estate of the late John Hopkins, upon like trusts and con-

ditions, and with all the rights and powers contained and vested in the said parties of the second part under and by virtue of the last will and testament of the late John Hopkins."

. On June 18, 1872, George W. and John S. as executors of the estate of John Hopkins, deceased, and also as trustees under the deed from Mix and wife, conveyed to James M. Latta said lots 3, 4 and 5 for $6784. On July 1, 1873, John S. gave to Mrs. Early a paper written by himself, containing a statement by the trustees of the sale of these lots. This paper was as follows:

"Sales of lots 3, 4, & 5, square 67 ....................... $6783 99
"Balance in interest, rents, &c..................,.... 262 10
————————
$7046 09

"One-half to Geo. W. Hopkins —　　$3523 04½
"Do. J. Hopkins ...... 7)3523.04½　　3523 04½
————————　————————
7046 09
"July 1st, 1873.　　　503.29 "

Prior to this date, two of the nine children of John Hopkins, namely, Levin and Isaac, had died intestate and without issue, and the other seven children were the beneficiaries under the will. According to this account rendered, one-half of the sum for which the lots had been sold to Latta went to George W. and the other half to John Hopkins's estate; and the half of John Hopkins was divided by seven, giving the share of each of the children as $503.29. October 11, 1873, Mrs. Early was paid her share and on the same day signed the following receipt:

"Rec'd of Geo. W. & J. S. Hopkins, executors and administrators of Jno. Hopkins' estate, five hundred & three ₁₀₀²⁹ dolls. in full of all demands due me from the said estate to date.

"$503₁₀₀²⁹. Washington, Oct. 11th, 1873."

November 29, 1873, Mrs. Lilburn, and December 24, Mrs. Hall and Mrs. Wailes, respectively, signed similar receipts for the sum of $503.29 each. George Washington Hopkins had

died intestate, and July 9, 1870, letters of administration had been issued on his estate to Mary A. Hopkins. October 1, 1873, Mary A. Hopkins, the administratrix, gave a similar receipt for George's share of the proceeds, $503.29. December 2, 1873, William M. S. signed the following receipt:

"Rec'd of Geo. W. & J. S. Hopkins, executors and administrators on John Hopkins's estate, five hundred and three $\frac{29}{100}$ dolls. in full of all demands due me from the said estate and also in full of any or all demands due me from the said parties above-mentioned up to this date — Dec. 2d, 1873.

"Washington, D.C.

"$503.29."

George W. and John S. Hopkins have passed away and, therefore, cannot explain the reasons for their action in thus treating these lots as belonging to the copartnership, but they were conversant with the facts and must be regarded as having acted understandingly upon that basis. The square was used by the partnership for partnership purposes, and it is not a violent presumption that these lots were purchased with partnership funds. The question on this branch of the case is, whether by bill filed fifteen years after Mix and his wife gave their deed, and eleven years after the distribution just stated, the heirs of the trustees ought to be held to account for the other half of the proceeds upon the ground that the lots belonged to John Hopkins individually. In our judgment such a conclusion is inadmissible under the circumstances.

The bill averred that the conveyance of William M. S. and his wife to his brother John S., executed June 20, 1860, and recorded July 7, 1860, was fraudulent and void, and procured in pursuance of a general scheme of fraud on the part of the trustees. William was not a party to the suit, but by the decree the deed seems to have been ignored, and Sarah E. Hopkins, William's wife, treated as assignee of his share. It is admitted that William signed this deed and delivered it to his brother, and we think it cannot be properly claimed that he was at the time mentally incompetent to execute it. It is

true he was in the Government Hospital from August 13, 1864, to September 2, 1864, and from January 19 to March 23, 1865, and also from September 19, 1868, to August 6, 1870, for dipsomania, the last time being after he had received a blow on the head; but there is much evidence that he was a man of intelligence and business capacity when not under the influence of liquor, and if there were any mental failure after September, 1868, that is not material here. He was called as a witness on behalf of complainants, and testified that his brother persuaded him to sign the deed; that he did not acknowledge it; that he signed his wife's name to it at the suggestion of his brother; and that she never knew about it. January 28, 1864, William conveyed to Christopher Ingle, for the benefit of his wife, all his interest in his father's estate, and the deed was recorded January 29, 1864. Ingle was not a party to the suit. On the margin of the book in which this deed was recorded is an entry, according to the custom in the recorder's office, to the effect that the original deed was delivered to the beneficiary in May, 1864.

Counsel on both sides refer to certain correspondence between John S. and Sarah E. Hopkins in the summer of 1873, in which both these deeds are mentioned. As to that to John S., Mrs. Hopkins wrote: "What William did I do not know, and if I signed it I signed it not knowing what it was, (which fault was not yours,) for the deed of trust in which William gives me the portion of his father's estate is duly recorded, and was January 29, 1864." In her testimony in chief, Mrs. Hopkins denied that she had joined her husband in a deed to John S., and asserted that she had never signed but one deed, which was a deed to sell a small house, in 1858 or 1859. She remembered that one of the magistrates who took the acknowledgment was named Donn. It appeared that the acknowledgment of the deed of 1860 to John S. was made before two magistrates, one of whom was Mr. Donn, while he was not one of the two justices of the peace before whom the deed of 1859 was acknowledged, and Mrs. Hopkins some days afterwards explained the reference to Mr. Donn as arising from a remark of counsel. However, upon cross-examination, she

testified that she was afraid she would not recommend any one to trust her memory twenty years back; and that as to the deed, she still did not recollect anything but the one deed, and yet she might have signed another. She had also completely forgotten her knowledge of the existence of the deed of January 28, 1864, to Mr. Ingle, to which she had referred in her letter of 1873, and which the record in the recorder's office showed had been delivered to the beneficiary in May, 1864.

We understand it to be conceded that when the evidence was taken in this suit both of the justices of the peace before whom the deed of 1860 was acknowledged, as is admitted by the bill, were dead; and, in the absence of evidence of fraud or collusion on their part, their certificate ought to prevail. Mrs. Hammond stated in her answer, upon information and belief, that this deed of 1860, though absolute on its face, was availed of by her father solely as a security and for the protection of his brother, the said William M. S., who was addicted to intoxication, and that the full share of William M. S. in the estate of his father was duly accounted for and paid to him. In the settlement of March 28, 1865, William's share, namely, $2667.60, was receipted for by John S., the latter presumably claiming the power to do this by virtue of William's deed to him. On March 29, 1865, William was credited with $2667.60 in an account opened before that time in a book kept by George W. and John S., and that account showed that there was paid to him, on or before June 5, 1865, in instalments, the aggregate sum of $2667.60, after deducting $1641.01, made up of $1579.49 due John S. and $61.52 for bill of furniture. On December 2, 1873, William receipted for $503.29, his share of the purchase money from the Mix lots, and in full of any or all demands to date. This amount is shown on the same account, and is made up of nine items of cash paid him, commencing with January 6, 1872, and closing with December 2, 1873. This was not a bill to set aside the deed, nor is it framed in the aspect of repudiating the payments to William as made in fraud of his wife. We do not care to comment upon the testimony of William in this

connection. We think complainants failed to make out their charges of fraud, and that apart from that, the defence of laches interposes an insuperable bar to contention upon this subject.

We perceive no adequate reason given for the delay in the attack upon this deed, nor in respect of the proceeds of the Mix lots, nor in the assault upon the account stated and settled in the orphans' court in 1865. We fail to find any ground assigned for the ignorance of plaintiffs of the proceedings upon the executors' accounting, or why they received and receipted for their distributive shares as determined thereby. Indeed, all the matters relied on to justify the imputation of fraud were known or could have been known to the plaintiffs just as well at the time when they transpired as when the bill was filed. No facts are shown of which plaintiffs were ignorant. No discovery was made which might not have been made during the nineteen years. It is true that the children of John Hopkins had confidence in their brother and uncle; but as for nearly twenty years they apparently saw no reason for believing that that confidence had been misplaced, it would require much more convincing evidence than this record affords to justify the conclusion that they had been in fact the victims of imposition. Indeed, we do not understand the testimony of the survivors as affirmatively questioning the integrity of the trustees.

Mr. Justice Merrick, in his well considered opinion in this case, after saying that "the question then reduces itself to the naked question whether the doctrine of a court of chancery, with regard to the necessity of the repose of society, is not sufficient to prevent the opening of this inquiry under these circumstances," proceeds to examine the two classes of cases to which the doctrine is applied, that of constructive fraud in the dealing by a trustee with the subject of the trust through an intervening person for the acquisition of the legal title, and that of actual fraud and concealment, and points out the greater liberality in respect of lapse of time in the latter class than in the former. Where there is no fraud in fact, he says :

"If the party, in view of all the facts of the case, has slept upon his rights, a court of chancery will not intervene; and in measuring laches there are two extremely important considerations always taken notice of by a court of chancery, which limit and narrow the measure of time which otherwise would be liberal. Where there has been no change of circumstances between the parties and no change with reference to the condition and value of the property, a court of chancery will run very nearly if not quite up to the measure of the statute of limitations as applied in analogous cases in a court of law. But where there has been a change of circumstances with reference to the parties and the property, and still more where death has intervened, so that the mouth of one party is closed, and those who represent his interests are not in a predicament to avail of the explanations which he might have made, out of the charities of the law and in consideration of the fact that fraud is never to be presumed, but must always be proved and proved clearly, the courts limit very much, in such cases, the measure of time within which they will grant relief, because the presumption comes in aid of the dead man, that he has gone to his account with a clear conscience. In this case one of these trustees, the survivor, remained in active life and energy for nineteen years after the alleged technical fraud is supposed to have been committed. There was no challenge, during that time, of the transaction. Had there been the law has a right to presume, and does presume, that he would have had opportunities of explaining these transactions and vindicating himself, which opportunities are now lost. The counter-presumption now arises, that there has been delay with a view to have the undue advantage of evidence on one side no longer capable of explanation on the other.

"This is this case stripped of all the surroundings with reference to it, stripped of all the imputations and suspicions piled one upon another with artful ingenuity, arising out of a number of minute circumstances, no one of which has in itself, apart from others, any significance. The effort has been made, I say, under such circumstances, to impute fraud.

"But it is very remarkable that, while the circumstances of

themselves do not carry any persuasive evidence of fraud to the trained judicial mind, the parties themselves who are impeaching the transaction, the surviving children who had knowledge of what occurred, in their evidence in this cause and under all the temptations to strain or overtop their testimony do not to-day impute any actual malversation to either of the trustees. The utmost they say is that if they have rights they want them. They never did call in question, in the lifetime of the trustees, the integrity of the trustees: they do not affirmatively call it in question to-day. They simply say, at the uttermost, that, if they have rights, as has been suggested to them, in regard to the possibilities of a legal administration of a trust in the manner in which I have stated, they want those rights. Now, under all these circumstances, with all this lapse of time, with all the knowledge they had then and there while the transactions were fresh, with all the temptations now in their own minds to pervert the facts, there is no one of those who are at all reliable in testimony — and I do not include W. M. S. Hopkins in this remark — who ventures to impute actual fraud to the trustees whose estates they are now calling in question."

We concur in these views. In all cases where actual fraud is not made out, but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollection of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence. The hour-glass must supply the ravages of the scythe, and those who have slept upon their rights must be remitted to the repose from which they should not have been aroused.

*The decree is reversed, and the cause remanded, with directions to dismiss the bill.*