# PRYOR *v.* McINTIRE.

### TRUSTS AND TRUSTEES; FRAUD; LACHES.

Where a trustee, taking advantage of the trust relation and confidence
reposed in him by simple-minded *cestuis que trust*, concocts and
carries into execution a scheme of fraud by means of false repre-
sentations and personation and the spoliation of papers, and
there are no intervening equities, no elements of estoppel, and
no inequitable conduct on the part of the injured parties, noth-
ing short of the statutory period of limitations in analogous cases
at law will bar their remedy.

No. 465.   Submitted December 4, 1895.   Decided January 6, 1895.

HEARING on an appeal by the complainant from a decree
dismissing a bill for an accounting and the cancellation of
certain deeds as fraudulent.   *Reversed.*

The COURT in its opinion stated the case as follows :

This is one of a series of five cases, argued and sub-
mitted at the same time, wherein different parties, com-
plainants, have sued the same defendants to cancel certain
deeds and annul certain pretended sales of lands, in the
District of Columbia, claimed to have been made by Edwin
A. McIntire, trustee, in violation of his obligations and
duties as trustee in certain express trusts, and in pursuance
of a scheme to defraud the makers and grantors therein.
The other cases are, No. 466, *Brown* v. *McIntire et al.*;
No. 567, *Ackerman* v. *McIntire et al.*; No. 468, *Southey et
al.* v. *McIntire et al.;* and 469, *Hayne et al.* v. *McIntire.*

A considerable part of the testimony is common to all of
the cases and was taken in one under a stipulation for its
consideration in all.

In this case the original bill was filed by Mary C. Pryor,
October 21, 1890, against Edwin A. McIntire, Martha Mc-
Intire and Hartwell Jenison, followed by an amended bill,
November 28, 1890.

Complainant alleges that, on May 2, 1880, she was seized, in her own right, of part of lots 21 and 22 in square 569 (the same fronting 19 feet on F street in the city of Washington), and that she and her husband, Thomas Pryor, since deceased, conveyed the same in trust to Edwin A. McIntire to secure the payment of a note for $450 made by them to the defendant Hartwell Jenison. That she and her husband were colored people, ignorant of business methods, and relied upon the representations of said Mc-Intire. That in the latter part of May, 1881, the note being then due and unpaid, he told them that he would be compelled to sell the property under the trust, but that said Thomas Pryor could bid off the property, and time would be allowed him to pay said indebtedness. That the sale was advertised and occurred June 17, 1881, when said Thomas Pryor became the purchaser at $700, and he and complainant remained in possession for some time. That McIntire informed them they should pay rent to him at $6 per month, which payments would be applied by him to the liquidation of the debt. That complainant has recently discovered that McIntire, instead of securing the property according to his representations, on the 28th of June, 1881, executed a deed, as trustee, of said lot to the said Hartwell Jenison, reciting a consideration of $806, which fact he concealed from complainant and her husband. That after making the said deed to said Jenison, said McIntire represented to him that the sum of $425 was necessary to pay taxes in arrears and expenses of sale, and procured from him authority to borrow said sum on the property. That he procured said Jenison to make a note for $425 to one Emma Taylor and to convey the lot to him, as trustee, to secure it. That about April 19, 1882, said McIntire represented to Jenison that the property could not be sold for more than the incumbrance, and induced him to execute a deed to said Emma Taylor for the amount thereof. Said deed was recorded April 21, 1882. That on September 27, 1887, McIntire again induced said Jenison to make a

quit-claim deed to said Emma Taylor under the pretence that the same was necessary to recover certain drawbacks for special taxes on said property. That Emma Taylor is a fictitious person and an invention of McIntire's in aid of his scheme to defraud. That the $425 note to her was not necessary to pay the taxes, etc., on said property, and was a device of said McIntire's to cover up a fraud both upon complainant and said Jenison, who relied on his representations.

That on May 31, 1884, said McIntire caused a deed to be made and executed, in the name of said Emma Taylor, to his sister, Martha McIntire, upon a pretended consideration, but really for his own benefit, etc.

The prayers of the bill are that an account be taken of what is due by the complainant on the $450 note of May 20, 1880, to Jenison, and of all rents and revenues of the property, and that upon payment by complainant of any balance due by her, the said deeds be declared null and void.

The defendant Hartwell Jenison filed an answer in which he says, that he was not present at the sale of the property and had no knowledge of any agreements between McIntire and the said Pryors. He admits that he signed an order for sale at McIntire's request, and that a deed was made to him of the property. He admits the representation of McIntire about the amount due after the sale to remove incumbrances upon the lot, and the execution of the note for $425 to Emma Taylor and the execution of the trust deed. He admits that upon McIntire's representations he subsequently conveyed the property to said Emma Taylor, and also made the quit-claim to her. He says that he never saw said Emma Taylor and does not know that there is such a person. That he was not aware of any fraud, and acted throughout under the advice and representations of McIntire, and had perfect confidence in his good faith. He says also that he received nothing from the rent of said property during the time that he owned the same.

The answers of the McIntires deny all the allegations of

fraud and the several agreements alleged by complainant. They say that the transactions were all with complainant's husband, who had frequently spoken of domestic trouble, and requested that all matters of business be kept from his wife and her relatives. That there was no understanding as to an extension of the debt when due, and that said Thomas Pryor told said McIntire he could not pay the note, and was willing to convey the equity to anyone that would assume it. That accordingly, on May 3, 1881, complainant and her said husband conveyed the said property to Martha McIntire, subject to the trust deed of May 2, 1880. That on the next day, May 4, 1881, said Thomas Pryor entered into an agreement with said Martha McIntire for the lease of the premises for contiuning his coal yard thereon. That afterwards, said Martha McIntire, finding out there was a large sum due for taxes, etc., on the lot, considered it was best to let it be sold under the trust deed. That the property was then advertised, on Jenison's authority, and also by his authority struck off to him for $806. That Jenison declined to pay the cost of sale, commissions, back taxes, etc., and authorized said McIntire to procure a loan of $425 for that purpose, which he did. That Jenison declined to pay that note when due, and decided to release his equity to the payee therein. That on June 29, 1881, in consideration of the surrender of his note, Jenison made a conveyance to said Emma Taylor who, about one month thereafter, conveyed to Martha McIntire.

That on September 27, 1887, said Jenison made a quit-claim deed to said Martha McIntire (and not to Emma Taylor, as alleged in the bill), to cure a defect in his former deed to Emma Taylor and to enable Martha McIntire to procure any rebate that might be made on account of the large sums paid for special taxes. They deny that Emma Taylor is a fictitious person, and say that she was " a Philadelphia lady who formerly lived in Washington, but is now living in the West." They allege also that Martha McIntire is a purchaser in good faith and has since erected

four brick houses on the lot; and that complainant, although living near by, made no claim to the property, etc.

The cases were submitted together, below, as here. The learned justice before whom the hearing was had, declining to pass directly upon the issues of fact, and expressing no opinion with respect thereto, dismissed the bill, in each case, upon the ground of laches in the several complainants.

*Mr. Franklin H. Mackey, Mr. H. O. Claughton* and *Mr. Wm. W. Boarman* for the appellant:

1. When a party claims the property of another under a deed of conveyance and it is charged that the party so claiming obtained it fraudulently and without the payment of any consideration therefor, he must, when the circumstances are such as to throw suspicion upon the transaction, show *clearly* and satisfactorily how he bought and paid for the property, where the purchase money came from, etc. *Clements* v. *Moore*, 6 Wall. 299, at p. 315 ; *Piddock* v. *Brown*, 3 P. W. 289 ; *Wharton* v. *May*, 5 Vesey, 49.

Martha McIntire cannot claim as a purchaser for value, nor as a purchaser without notice of her brother's fraud, for she and he both repeatedly testify that he was her agent in all these transactions, and it is well settled that the knowledge of the agent is the knowledge of the principal. *Johnson* v. *Laflin*, 103 U. S. 800. And the rule that notice to the agent is notice to the principal applies not only to knowledge acquired by the agent in the particular transaction, but to knowledge acquired by him in an *antecedent* transaction, and present to his mind at the time he is acting as such agent. *Harrington* v. *United States*, 11 Wall. 356 ; *Aston* v. *Wells*, 4 Wheat. 466 ; Pom. Eq. Jur., sec. 676.

2. Evidence of fraud of like character committed by the same parties at or near the same time is admissible to prove the fraud complained of. The evidence of McIntire's fraud as it is found in respect of any one of these properties is ad-

missible to support the charge of fraud in respect of each of the other properties. *Lincoln* v. *Claflin*, 7 Wall. 138 ; Bigelow, Fraud, vol. 1, 161. See also *Castle* v. *Bullard*, 23 How. 186.

3. In cases of *actual* fraud in connection with *real estate*, the rights of *bona fide* purchasers for value not intervening, courts of equity never refuse relief on the ground of delay if the delay after the discovery of the fraud is not longer than the period fixed by the statute of limitations, viz., twenty years, and the complainant might have had a concurrent remedy at law, for equity will not apply a shorter period of limitations than would be applied at law. If, however, the estate be equitable, then, since the complainants' remedy is *only* in equity, relief will be granted even *after* the lapse of the statutory period if the fraud be actual, but if the fraud be *constructive* only, even a less period, under exceptional circumstances, than that fixed by the statute of limitations will prove a bar to relief. *Michoud* v. *Girod*, 4 How. 503 ; *Baker* v. *Whiting*, 3 Sumn. 476 ; *Wagner* v. *Baird*, 7 How. 234.

No varying from this rule can be found in any of the subsequent decisions of the Supreme Court. *Allore* v. *Jewell*, 94 U. S. 506 ; *Insurance Company* v. *Eldridge*, 102 U. S. 545 ; *Kilbourne* v. *Sunderland*, 130 U. S. 505 ; *Hammond* v. *Hopkins*, 143 U. S. 24 ; *Speidel* v. *Henrici*, 120 U. S. 377.

In Maryland also the same rule appears, as is clearly shown by the case of *McDowell* v. *Goldsmith*, 2 Md. Ch. 370.

The plaintiffs could, had they chosen to do so, have brought their actions *at law* for the recovery of her property, but because of the *trust* and the *fraud*, which are peculiarly the province of equity to deal with, and because the remedy here is more adequate and complete, she came to the chancellor for relief. This she was justified in doing by the ruling of the Supreme Court in *Wherman* v. *Conklin*.

There is still another principle upon which cases of actual fraud are held not to come within the rule that delay may

bar relief, and that is the principle of *estoppel*. A man who has committed only a constructive fraud has no moral turpitude upon his conscience.

Such a case is quite a different one from that of the trustee who obtains the property of his *cestui que trust* by *actual* fraud. Such a man, when his fraud is discovered and he is brought to a reckoning, is *estopped* in a court of equity to say, "You allowed me to keep the stolen property too long;" and this rule applies as well to his grantee as himself, if that grantee be not a *bona fide* purchaser for value. This is the doctrine of the Supreme Court of the United States in its most recent utterances. *Allore* v. *Jewell*, 94 U. S. 506; *Insurance Co.* v. *Eldridge* 102 U. S. 545; *Kilbourne* v. *Sunderland*, 130 U. S. 505. And this court, in the recent case of *Murphy* v. *Kirby*, 3 App. D. C. 207, quotes with approval the language of the Supreme Court of Missouri, in *Pomeroy* v. *Benton*, 57 Mo. 543, that "It is no excuse for nor does it lie in the mouth of the defendant to aver that plaintiff might have discovered this wrong."

A party who seeks to avoid the consequences of an *apparently unreasonable* delay in the assertion of his rights on the ground of ignorance must allege and prove not merely the fact of ignorance, but when and how knowledge was obtained. *Hardt* v. *Heidweyer*, 157 U. S. 547. But in a case of actual fraud, no delay of less than twenty years will be so unreasonable as to bar relief.

The true principle in all cases of fraud is that delay *per se* does not bar relief, but because it affects the *strength* of the evidence. *Moore* v. *Royal*, 12 Ves. 355; *Hatch* v. *Hatch*, 9 Ves. 292; *Hickes* v. *Cooke*, 4 Dow. 16–24. It is not simply and only because of delay that relief is refused, but because that delay, where the facts and circumstances are not such as to overcome it, induces the presumption that *some* evidence has been lost which would avail the defendant could it be produced.

In all cases where laches is set up as a defence, the question is, what *wrong* will the defendant suffer if the plaintiff

is granted relief, conceding that the complaint is made after long delay ? If a party has a clear right in equity and it appears that no unconscionable result will follow relief, mere delay in bringing his action will not cause a court of equity to refuse it. *Spurloch* v. *Sproule*, 72 Mo. 503 ; *Neblett* v. *McFarland*, 92 U. S. 100–105 ; *Brooks* v. *Martin*, 2 Wall. 70 ; *Kilbourn* v. *Sunderland*, 130 U. S. 505 ; *Boone* v. *Chiles*, 10 Pet. 177 ; *Meador* v. *Norton*, 10 Wall. 442 ; *Hallet* v. *Collins*, 10 How. 174 ; *Murphy* v. *Kirby*, 3 App. D. C. 207.

*Mr. Enoch Totten* for the appellees :

1. Plaintiffs are barred by their laches, delay and acquiescence. Courts of equity require great diligence on the part of persons in discovering their rights in reference to real estate, and delays of the kind shown in these five cases are not susceptible of explanation or excuse upon such frivolous statements as those relied upon by these plaintiffs. *Murphy* v. *Kirby*, 3 App. D. C. 207 ; *McKnight* v. *Taylor*, 1 How. 161 ; *Sterns* v. *Page*, 7 How. 829 ; *Hoyt* v. *Sprague*, 103 U. S. 636 ; *Hammond* v. *Hopkins*, 143 U. S. 251 ; *Galligher* v. *Caldwell*, 145 U. S. 373 ; *Foster* v. *Mansfield*, 146 U. S. 99 ; *Johnston* v. *Mining Co.*, 148 U. S. 370 ; *Lane* v. *Locke*, 150 U. S. 201 ; *Halstead* v. *Grinnan*, 162 U. S. 416 ; *Harwood* v. *Railroad Co.*, 17 Wall. 78 ; *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587 ; *Brown* v. *Buena Vista Co.*, 95 U. S. 157 ; *Hayward* v. *National Bank*, 96 U. S. 611 ; *Holgate* v. *Eaton*, 116 U. S. 33 ; *Davidson* v. *Davis*, 125 U. S. 90 ; *Societe Fonciere* v. *Milliken*, 135 U. S. 304 ; *Oliver* v. *Gray*, 9 H. & G. ; *Clabaugh* v. *Byerly*, 7 Gill, 364 ; *White* v. *White*, 1 Md. Ch. 53 ; *Hitch* v. *Fenby*, 6 Md. 218, 224 ; *Glenn* v. *Hebb*, 17 Md. 260 ; *Nelson* v. *Bank*, 27 Md. 51 ; *Hill* v. *Clagett*, 48 Md. 223 ; *Amey* v. *Corkey*, 73 Md. 305 ; *Golden* v. *Kimmell*, 99 U. S. ; *Richards* v. *Mackall*, 124 U. S. 186.

2. No facts are shown by plaintiffs to call for any relax-

ation of the rule against laches. These are certainly not
" hard cases," where the bar of limitations stands in the way
of doing a plain act of equity or justice, but rather cases
which illustrate the salutary effect of the rule dispensing
defendants from making proof against dubious and specula-
tive claims, trumped up years after the events on which
they rest.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. Before proceeding to the consideration of the question
of laches we think it necessary, as well as proper, to state
our conclusions with respect to the questions of fact that are
in issue.

A great mass of evidence has been introduced not only
concerning the particular issues in this cause, but also re-
specting the important issue, common to all the causes, as
to the existence of the person called Emma Taylor.

Some of this evidence is incompetent, and much is incon-
sequential; but to review it in detail, pointing out those
particulars and giving an abstract of that upon which our
conclusions are founded, would, we think, be an unneces-
sary consumption of time and space.

Without, then, entering into those particulars, we con-
sider it sufficient to say, that after a careful consideration of
such of the evidence as is clearly competent and relevant,
we have arrived at the following conclusions:

(1) There is no such personage as the Emma Taylor who
figures in the transactions of this and the other cases as
grantee and grantor in certain deeds and instruments of
writing. She is an invention of Edwin A. McIntire.

(2) Who actually signed the name, Emma Taylor, and
personated her in acknowledging the execution of the many
deeds purporting to have been made by her, need not be
certainly ascertained. The evidence, however, tends strongly
to show that Emma T. McIntire, sister of the defendants,
signed the name to all of the said deeds. Two experts

in handwriting, of reputed skill, express that opinion. Comparison of the Emma Taylor signature with certain signatures of Emma T. McIntire, acknowledged to be genuine, does not tend to lessen the weight of the expert testimony. Certain facts and circumstances tend to strengthen the conclusion.

Annie L. Galliher, who is the daughter of a brother of Emma T. McIntire, testified that her father's name was Edwin Taylor McIntire, and that the T in her name stood for Taylor; and that she was ordinarily called Emma Taylor, in the family, to distinguish her from witness' sister, Emma V. McIntire. Edwin, Martha, and Emma T. McIntire denied this, and said that Emma had herself assumed the T to distinguish her from other Emma McIntires, and it had suggested itself because her father had often called her "Tinsey ush," and she had, when small, called herself "Tots." Our conclusions with regard to the evidence of these persons, upon certain other points, are such that we cannot accept their statements as sufficient to overcome the evidence of a single unimpeached witness, who, besides, has no pecuniary interest in the case, whatever may be the ill-feeling between her and them. Moreover, a certain unquestioned and unexplainable fact, which was under the circumstances relevant testimony, shows that the said brother and sisters were capable of such personation and fraudulent imposition upon an officer authorized to authenticate instruments. They had another sister, Sarah I. McIntire, who died in Philadelphia, January 10, 1881, leaving a deposit of $1,196.60 in the Philadelphia Saving Fund Society. Martha McIntire drew this money upon the presentation of a power of attorney purporting to have been executed on May 2, 1881, by said Sarah I. McIntire, and acknowledged on the same day before a notary public in the city of Washington. The blank spaces of this instrument were filled out by E. A. McIntire, and he subscribed the same as a witness.

(3) Martha McIntire is not an innocent purchaser of the property in controversy in this or in any one of the cases.

She and her sister Emma T. McIntire, have, under the influence of their brother Edwin, co-operated with him in his schemes to defraud this and other complainants.

Whether the money advanced from time to time in making loans, purchases and improvements, really belonged to Martha McIntire, is immaterial. As between her and her brother Edwin A. McIntire, it must be regarded as belonging to her. In taking an account thereof, and of rents received, whether in her name, or that of Emma Taylor, she must be regarded as the party interested.

(4) Hartwell Jenison is an old man, and has been engaged as a clerk in the Treasury Department of the United States for many years. He first loaned $500 on the property, taking the assignment of a note to Geo. E. Emmons secured by trust deed. The transactions were all arranged by and through a brother of Edwin A. McIntire, who was a fellow clerk. Pryor paid the interest and $50 of the principal, the collection of which was attended to by Edwin A. McIntire. He negotiated a renewal for the remaining $450 of the principal, and caused a new note and trust deed, with himself as trustee, to be given by the Pryors. When the note matured, McIntire informed Jenison that the Pryors would pay no more, and that improvement taxes and incidental expenses would amount to about as much as the face of the note. Jenison, having no more money, requested McIntire to do the best he could with the property.

Jenison did not attend the sale, and was afterwards shown the deed made to him as purchaser. McIntire then caused him to execute a note for $425 to Emma Taylor, and a trust deed on the lot to secure the same. This sum McIntire told him was necessary to pay the taxes and expenses. McIntire found no purchaser for the property, and when the note fell due, Jenison, at his instance, conveyed the lot to Emma Taylor and received his note. No money was paid him. He subsequently, at McIntire's request, made the quit-claim to Martha McIntire to perfect the title, and was paid $100.

Jenison is apparently a credulous old man of little business capacity, and it is evident that he made no inquiry into the facts himself, but relied implicitly on the statements of McIntire, who was his agent and trusted adviser throughout.

During the time that elapsed between the sale to him and his deed to Emma Taylor, McIntire collected $6 per month rent of Thomas Pryor, of which no account was rendered to Jenison. Jenison has recived $100 from the loan, and no interest whatever.

(5) Mary C. Pryor and her husband were simple-minded colored people, and relied fully in the integrity of Edwin A. McIntire, whom they believed to be their friend. They trusted him to arrange the second renewal of the loan and also the third. He led them to believe that a sale would be formally made on account of the Jenison note, but the property would be secured to them. He evidently led them to believe that the sale would be and had been made to Thomas Pryor. Probably he intended at first to continue the loan in the name of his sister Martha, for, on May 3, 1881, he caused the Pryors to convey the property to her, upon a recited consideration of $5 and the payment by her of the incumbrance thereon. On the next day the property was leased by her to said Pryor for $6 per month. The Pryors evidently understood this as carrying out the agreement by which time was given, and that the rent payments were to be devoted to the liquidation of the debt.

Pryor paid the rent for several years, until his business failed. He and his wife had the key to the place, on September 24, 1884, when, at the request of McIntire, they gave it to Mr. Mack, a tenant, who then entered and paid rent to Edwin A. McIntire regularly for about fourteen months. The complainant then claimed ownership of the property, and did to the builders who afterwards erected the houses now claimed by Martha McIntire.

(6) Complainant delayed the institution of her suit until October 21, 1890, more than nine years after the sale under

the Jenison trust deed. She was very poor and had but little intelligence. That she had perfect confidence in McIntire, in the beginning, is evident. She was kept in ignorance of the facts of the sale, and of the truth about the so-called Emma Taylor, and had no information with respect thereto until a short time before the institution of this suit, when she learned from the publication of the facts in a suit brought by certain heirs of David McIntire against Edwin A. McIntire, that said Emma Taylor was probably a fictitious person, whose name was used by said Edwin A. McIntire in perpetrating frauds upon her and others.

(7) The lot in controversy, at the time of the sale under the trust deed in June, 1881, was worth about $2,000 exclusive of the improvements. At the time the testimony in this cause was taken, September, 1893, the lot was worth about $3,900, exclusive of improvements. There were some back taxes due on the lot in 1881, but not so much as represented by McIntire to Jenison.

2. It remains now to consider whether the defendants shall be permitted to hold and enjoy the fruits of their fraud because of the laches of the complainant in the prosecution of her just and equitable claim.

In this consideration it must be borne in mind, that the complainant is an ignorant colored woman, unfamiliar with the transaction of business and easily deceived. She was poor and friendless. The assertion of her equity depended, for its foundation, upon parol evidence. Besides, it could avail nothing against the titles of Jenison and " Emma Taylor," who, as to her claim, were the apparent holders of superior equities. Until she learned that said " Emma Taylor " was probably an invention of McIntire, and was thereby induced to inquire of Jenison concerning the facts, she can hardly be blamed for her inaction. Nor is there any reason for holding that she ought to have discovered those facts sooner.

Under all the circumstances we think the delay was not unreasonable. Moreover, there has been, in addition to

the delay, no conduct whatever, under all the circumstances, that can be held to amount to acquiescence, or to a waiver of her right to redress. There has been no change in the situation of the parties ; no sudden or great increase in the value of the property ; no intervening equities of innocent persons ; no loss of important testimony, nor death of witnesses whose evidence might probably have created a doubt with respect to the fraudulent conduct of the defendants.

Nothing but the mere lapse of time—less than one-half that which would bar an action at law to recover possession—stands between the complainant and the enforcement of her undoubted right.

It is true that one witness has died, pending the suit, whose testimony would have been material. This was William Helmick, the justice of the peace who certified to the acknowledgements of the several deeds by the so-called Emma Taylor. In the light of all the facts, however, it is not possible that the defendants have been put to any disadvantage by the loss of his testimony. Presuming him to have been honest, as we must, his testimony would, more likely, have strengthened the case of the complainant. The so-called Emma Taylor was doubtless introduced to him by McIntire and he certified to her as well known to him through confidence in the truth of his representations. He could not have testified otherwise without making himself a party to the conspiracy to defraud, because, as we have heretofore announced, there was no such person as said Emma Taylor in existence.

The familiar maxim, that, " equity aids the vigilant," is a typical doctrine of equity jurisprudence, and in its application, best illustrates the beneficent spirit of its administration. The rule is neither arbitrary nor technical ; but capable of rigid contraction on the one hand, and of wide expansion on the other, in the sound discretion of the chancellor, according to the special circumstances of each particular case. This idea is well expressed by Mr. Justice BREWER, in the following words : " The length of time dur-

ing which the party neglects the assertion of his rights, which must pass in order to show laches, varies with the peculiar circumstances of each case, and is not, like the matter of limitations, subject to an arbitrary rule. It is an equitable defence, controlled by equitable considerations, and the lapse of time must be so great, and the relations of the defendant to the rights such, that it would be inequitable to permit the plaintiff to now assert them." *Halstead* v. *Grinnan*, 152 U. S. 412, 416.

We are not content, however, to rest our decision of this case upon the sufficiency merely of the excuses offered for the delay. They are not of the strongest, and in some classes of cases might be held insufficient. We will therefore go a step further in the announcement of a doctrine applicable not only to this case, but those that have been argued and submitted with it.

The testimony clearly shows that Edwin A. McIntire, not satisfied with the liberal fees and charges of the business, conceived the idea, early in his relations with complainant and with Jenison, of defrauding them. Taking advantage of the trust relations and the confidence reposed in him by simple-minded people, he concocted his several schemes and carried them into execution through his false representations and personations and the spoliation of papers.

In such cases, where there are no intervening equities, no elements of estoppel, and no inequitable conduct on the part of the injured parties themselves, is not a court of equity warranted in holding that nothing short of the statutory period of limitations in analogous cases at law, should bar the remedy? We think so, clearly, and believe that we are supported both by reason and authority.

In *Prevost* v. *Gratz*, 6 Wheat. 481, 497, the court said: " It is certainly true that length of time is no bar to a trust clearly established ; and in a case where fraud is imputed and proved, length of time ought not, upon principles of eternal justice, to be admitted to repel relief."

In the noted case of *Michoud* v. *Girod*, 4 How. 503, 560, where an executor's sale was set aside for constructive fraud after the lapse of more than twenty-seven years, Mr. Justice WAYNE, speaking for the court, said: " In a case of actual fraud, courts of equity give relief after a long lapse of time, much longer than has passed since the executors, in this instance, purchased their testator's estate. In general, length of time is no bar to a trust clearly established to have once existed ; and where fraud is imputed and proved, length of time ought not to exclude relief. *Prevost* v. *Gratz*, 6 Wheat. 481. Generally speaking, when a party has been guilty of such laches in prosecuting his equitable title as would bar him if his title were solely at law, he will be barred in equity, from a wise consideration of the paramount importance of quieting men's titles, and upon the principle that *expedit rei publicæ ut sit finis litium ;* and although the statutes of limitations·do not apply to any equitable demand, courts of equity adopt them, or, at least, generally take the same limitations for their guide, in cases analogous to those in which the statutes apply at law. 10 Ves. 467 ; 1 Cox, 149. Still, within what time a constructive trust will be barred, must depend upon the circumstances of the case. *Boone* v. *Chiles*, 10 Pet. 177. There is no rule in equity which excludes the consideration of·circumstances, and, in a case of actual fraud, we believe no case can be found in the books in which a court of equity has refused to give relief within the lifetime of either of the parties upon whom the fraud is proved, or within thirty years after it has been discovered or becomes known to the party whose rights are affected by it."

Our conclusion on this point has the support of the following well considered cases. *Lawrence* v. *Rokes*, 61 Me. 38 ; *Platt*·v. *Platt*, 58 N. Y. 646 ; *Aylett* v. *King*, 11 Leigh, 486 ; *Gibbons* v. *Hoag*, 95 Ill. 45, 69 ; *Scherer* v. *Ingerman*, 110 Ind. 428, 433 ; *Ryle* v. *Ryle*, 41 N. J. Eq. 582 ; *Archbold* v. *Scully*, 9 H. L. Cas. 360, 387 ; *De Bussche* v. *Alt*, L. R. 8 Ch. Div. 286, 314.

The case of *De Bussche* v. *Alt,* is cited with approval by the Supreme Court of the United States. *Kilbourn* v. *Sunderland,* 130 U. S. 505, 519. In that case, which was one where agents had defrauded their principal, Chief Justice FULLER said : " Reasonable diligence is of course essential to invoking the activity of the court, but what constitutes such diligence depends upon the facts of the particular case. Where a party injured by fraud is in ignorance of its existence, the duty to commence proceedings arises only upon discovery, and mere submission to an injury after the act inflicting it is completed can not generally, and in the absence of other circumstances, take away a right of action, unless such acquiescence continues for the period limited by the statute for the enforcement of such right."

We find nothing in the later decisions of the Supreme Court, to which we have been referred by appellees, in denial of the doctrine of the earlier cases, or that which is expressed in the quotation from *Kilbourn* v. *Sunderland, supra.*

The case most relied on is *Hammond* v. *Hopkins,* 143 U. S. 224. But in that case the bill was filed immediately before the expiration of twenty years after the sale complained of. The court found there was no actual fraud on the part of the trustee and that everything was known to, and acquiesced in by, the *cestuis que trustent* at the time, and held that laches barred the complainants. That the distinction between that case and one of actual fraud, was borne in mind, is apparent from the concluding part of the opinion, where the court, speaking, as in *Kilbourn* v. *Sunderland,* through the Chief Justice, said : " In all cases where actual fraud is not made out, but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollection of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence."

In the latest expression of the court upon this subject, viz : *Abraham* v. *Ordway,* 158 U. S. 416, to which also

appellees refer, there was no fraud.   In fact all equities of the case seemed to be on the side of the party complained of.

It is unnecessary to discuss the question further. We cannot, solely on account of the delay of the complainant, refuse to undo the frauds that have been committed against her, and deny her the relief to which she has shown herself to be entitled.

The decree appealed from must, therefore, be reversed, with costs to the appellants.   The cause will be remanded to the court below, with direction to take an account of the indebtedness remaining due by the complainant to Hartwell Jenison, together with an account of the reasonable value of the rents and revenues collected by the defendants since May 4, 1881, or that should have been received by them, as well as of all moneys that have been expended by them, or either of them, in the payment of taxes and all other proper charges on said premises.   And upon the coming in of such report a final decree will be passed annulling each and all of the several trust deeds and conveyances that cloud the title to said premises, and awarding possession thereof to plaintiff upon her paying, within a reasonable time, whatever sums may be found to be actually due, first to said Hartwell Jenison and then to the defendant, Martha McIntire, upon the settlement of the account aforesaid ; all costs to be taxed against defendants.   It is so ordered.

*Reversed.*