## THOMPSON v. AFRO-AMERICAN CO. et al.

### No. 6174.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 13, 1950.

Decided Dec. 6, 1950.

Rehearing Denied Jan. 23, 1951.

Paul Berman, Baltimore, Md. (Sigmund Levin, Baltimore, Md., Carson DeWitt Baker, New York City, and Theodore B. Berman, Baltimore, Md., on the brief), for appellant.

Marshall A. Levin, Baltimore, Md. (Harry O. Levin, Baltimore, Md., on the brief), for appellees.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and BRYAN, District Judge.

BRYAN, District Judge.

On September 27, 1930 appellant transferred to The Afro-American Company, for $1200.00, his beneficial interest, under a testamentary trust, in 40 shares of the company's capital stock, and seven months later these shares were acquired from the corporation by the appellees who were the executors and trustees having custody of the trust estate and also directors of the corporation. The questions here are whether the transaction was a loan or a sale, and if the latter, whether it is annullable as an infirm agreement between trustee and cestui, an undertaking always suspect.

The appellant declares it was a loan, with the stock as collateral, and seeks restoration of his rights in the stock, an accounting of dividends, and damages. The appellees' position is that the appellant, for a fair and adequate consideration, parted with all interest in the stock in 1930 and has had none since the date of the transfer. To this the appellant rejoins that, if a sale, the transfer should be vacated as a purchase of the stock by the individuals who had held it in trust for him. Emphatic denial of any violation of their trust is made by these defendants.

With the District Judge we think that it should be sustained as an unconditional sale untainted by fraud, actual or constructive.

The shares in suit are a part of the capital of the defendant The Afro-American Company. John H. Murphy, sr. had been the principal founder of this company. Of 648 shares issued and outstanding, he owned 400 at the time of his death in 1922. Having an earned pride in the aims and achievements of the company—the publication and circulation of newspapers especially devoted to the interests of the Negro—John H. Murphy, sr. endeavored in his will to perpetuate its work, to keep control of the company within his family, and to have them receive the pecuniary benefits forseeable in the continued ownership of it.

To this end he created what in effect was a testamentary voting trust of his stock. As his executors he named his two sons, George B. Murphy, Sr., and Carl James G. Murphy; as trustees he named his sons, John H. Murphy, Jr., David W. Arnett Murphy and Daniel H. Murphy, but Daniel predeceased his father. Designated to be beneficiaries of the stock were his nine children and the appellant, Noah Murphy Thompson, who was his grandson and the son of a deceased daughter. By paragraph First of his will the testator bequeathed his 400 shares of stock to the named trustees "in trust, that the said trustees shall continue the business now conducted by the said The Afro-American Company and pay over the net proceeds from said business equally between Eva. S. Purdy, George B. Murphy, Harriett E. Gilbert, Martha Frances Louise Murphy, M. Rose Oliver, Daniel H. Murphy, John H. Murphy, jr., Carl James G. Murphy, David W. Arnett Murphy, and Noah Murphy Thompson."

Paragraph Fifth of the will directed: "It is my will that the shares of stock bequeathed in paragraph numbered one of this my will to the trustees as aforesaid, shall not be sold or disposed of to any one, unless an exigency should arise wherein the sale of said stock should become inperatively necessary or highly advantageous, in the event that the sale of said stock shall become imperatively necessary, preference shall be given to any one or more of the cestui que trust enumerated in paragraph numbered one of this my will at par value of said stock."

Thus it will be seen that Noah Thompson held an undivided one-tenth beneficial interest in the entrusted stock. The events leading to the transaction in litigation commence with his letter of March, 1930 when the appellant was 25 years of age, inquiring of his uncle, defendant Carl James G. Murphy, as to how many shares Noah owned in the company. Later in the same month the appellant wrote asking the company to

make him a loan of $69.50 and this was granted. Appellant testified that in June 1930 he sought another loan from the company, this time on his stock as security, but it was refused. August 1, 1930 appellant by letter to Carl Murphy asked whether he could "sell" his interest in the stock to the company. In answer his uncle's secretary wrote Noah, August 2, 1930, "to come down to see him about *selling* your shares of the Afro-American interest". Noah was then in New York, his uncle in Baltimore. Noah's letter of August 5, 1930, acknowledged his uncle's invitation to see him "concerning the *selling*" of his shares in the company.

Pursuant to this correspondence the appellant visited his uncle Carl, told him that he desired to obtain money to attend a secretarial school and, he says, informed his uncle that he wished to obtain a loan on his stock for that purpose. After showing him his grandfather's will, explaining its provisions and pointing out its restrictions as to sale, Carl promised Noah that he would confer with the board of directors on the subject at their next meeting.

The previous meeting of the board of directors had been held August 9, 1930, the day before the conference and the minutes of the meeting reveal that the president, Carl Murphy, submitted a letter from the appellant "asking for permission to *sell* his stock to the Afro-American Company". The minutes record "that the suggestion was offered, that his stock be *bought* from him at the market price of $1200.00 to be paid to him in monthly installments, not exceeding $33.00 per month, extending over a period of approximately three years".

Evidently appellant was pressed for money, because repeatedly he urged that the transaction be closed without delay. The minutes of the board of directors further disclose that at their meeting on September 11, 1930 "the board thought it best to *purchase* the stock of Mr. Thompson (Noah Thompson) at the market price of $1200.00 to be paid to him at the rate of $33.33 per month over a period of 3 years."

Negotiations were concluded by a formal written agreement, signed by the appellant on September 27, 1930, and reciting that the appellant "proposed to *sell* and transfer" to the company "his undivided one-tenth interest in said four hundred (400) shares of stock free and clear from the trust impressed thereon for and in consideration of the payment to him by the said Afro-American Company of Baltimore City". By the terms of the agreement the trustees consented to the sale, the appellant's entire interest was transferred to the company, and the latter covenanted to pay the appellant $1200.00 at $33.33 per month, the first four payments to be made on September 27, 1930 and the other payments to follow on the first day of each month beginning February 1, 1931.

By his signed receipt dated May 21, 1933 Noah M. Thompson acknowledged "full payment for 40 shares Afro-American Company stock".

Against this documentary proof of sale, the appellant offers not a jot of writing to sustain his charge that the transaction was a loan—so devoid, indeed, of written evidence as to render the "*loan*" uncollectible after the lapse of the limitation on open accounts. His defendant uncles testified clearly and explicitly that the transaction was a sale. Noah testified to the contrary. The trial judge believed the uncles and rejected the version of the appellant. In this he was amply justified.

On April 4, 1931 the 40 shares surrendered by Noah Thompson were acquired in equal participation by the individual defendants, and transfer thereof made to them by the corporation. The four were then directors of the company, two of them were also John Murphy's trustees and the other two had been his executors. These appearances forcefully argue a breach of trust—ultimate purchase by trustees of trust property from a trust beneficiary—and throw a shadow of invalidity upon the sale. Presumptively the transaction is vulnerable. Maryland, as do almost all jurisdictions, stamps such a purchase voidable. The sale is vitiated unless the fiduciary expurgates it of every inference of unfairness implicit in such a transaction. Harlan v. Lee, 174 Md. 579, 199 A. 862; Hammond v. Hopkins, 143 U.S. 224, 12 S.Ct. 418, 36 L.Ed. 134.

But the defendants have done just that. Appearances of a breach of trust there were, but appearances and nothing more. Scrutiny of the defendants' actions dispels every implication of wrongdoing.

From the inception of the negotiations with Noah, his uncles discouraged his desire to dispose of his stock. They recalled to him the wish of his grandfather that the shares remain intact; they held out to him the pecuniary advantage to be expected from the retention of his stock; they delayed action on his request in the hope that he would reconsider; they enlisted his father's aid to guide him; but their efforts were in vain. Their solicitude for him is evidenced by the stipulation for installment payments, after satisfying his immediate needs, to protect him against possible prodigality.

Again, the evidence abundantly supports the finding of the District Judge that $30.00 per share was a fair price for the stock. The terms of the will prescribed "par value" to be the purchase price in the event of sale. That would have been only $5.00 per share. In fact, he was paid the same price demanded and exacted of the corporation by a hostile stockholder under threat of suit.

The defendants were placed by the appellant in an unenviable position. They felt their avuncular obligation to him, as the child of their deceased sister, to consider his straitened circumstances, they felt their fiduciary duty to him as a cestui, and they felt the injunctions of their father's testament. His will permitted a sale to meet necessity, but urged that the family be preferred as purchasers. Four of the family were fiduciaries. Thus the will contemplated a possible purchase by the fiduciaries of the interest of their beneficiaries. No other member of the family is shown to have been desirous of acquiring Noah's stock interest. None has complained and all were aware of the opportunity. The accused four, in open dealing, met the necessitous demands of the appellant and at the same time fulfilled their obligations to their trust.

Softening the ominous appearance of the stock-purchase in April, 1931 is the fact that it was not of Noah's stock alone. In all 128 shares were bought. The aggregate comprised Noah's 40, a like number belonging to another beneficiary, Eva S. Purdy, appellant's aunt, and 48 shares of treasury stock, which had not theretofore been issued. Thus each of the four defendants then obtained 32 shares.

No concealment of their acquisition was made by Noah's uncles. When he signed the receipt in 1933 for the full payment of his stock he was unequivocally told that his stock had been purchased by the four of them.

With the District Judge we exonerate the defendants of any imputation of failure to keep their trust. The four paid fairly for all stock they obtained from the company. True, records of the stock transfers, correspondence with the appellant, and entries covering stock purchases, including the method of payment therefor, are either wanting, meager or wholly inadequate, but in this we can find no indicium of a purposeful omission or spoliation of a record. Rather the failure is attributable to neglect or ignorance of the importance of a meticulous record, a condition not unusual in a business owned and conducted almost exclusively as a family affair. Then, too, it must be remembered that the records are here sought after a lapse of 17 or 18 years, during which period the transaction had never been questioned.

This brings us to consideration of the bar of laches against the appellant. His first complaint was voiced in 1946, the year before the institution of the present action. His ownership was made an issue, but never adjudicated, by his answer in a suit commenced by the trustees in a Maryland State court for a construction of the trust in the Murphy will, the suit averring the appellant's total absence of any interest in the trust.

The picture is that from 1933, when he receipted for his shares, until 1946 he never asserted an interest in the stock. After 1930 he at no time attended the meetings of the stockholders, contrary to his previous practice. All the while he was in touch with the corporation, in fact employed by it from 1932 to 1944 with the exception of

the thirteen-month period from November 1935 to January 8, 1937. Throughout he was in constant touch with his uncles, visited with them and exhibited a natural nepotal affection for them. In 1941 he asked if he would receive any dividends from the company, and when reminded of his relinquishment of his stock made no protest. He was then 36 years old.

Acquiescence for sixteen years, with full knowledge of all the circumstances, establishes an irrevocable confirmation by him of the transaction for what it was—an absolute sale.

That this lapse of time has resulted in prejudice to the defendants is obvious. We have already alluded to an absence of records easily ascribable to the passage of time. Moreover, the defendants, in reliance on their acquisition of the stock, have devoted their energies and their days, diligently and successfully, to the development and expansion of the business of the company; they have thus irretrievably acted on the assumption that the transfer was valid.

The other defenses aside, appellant's laches and confirmation deprive his suit of every scintilla juris. Hammond v. Hopkins, 143 U.S. 224, 12 S.Ct. 418, supra; Reeder v. Lanahan, 111 Md. 372, 74 A. 575.

The judgment of the District Court in dismissing the complaint was plainly right and will be affirmed.

Affirmed.